WELLINGTON CLAPP et al. *vs.* HENRY G. ELY et al.

1. Under the laws of this state, no judgment by confession can be entered to secure future advances; it must be for a lawful debt, founded on a legal consideration and for a debt justly and honestly due and owing at the time of the entry of the judgment.

2. Creditors whose rights are affected by a confessed judgment may contest its validity, and, to this end, may show that the judgment has been entered in violation of the statute.

3. The affidavit required by the statute is a pre-requisite to the entry of the judgment, and essential to its validity.

4. If no affidavit be made, or if the affidavit do not in substance specify the true consideration of the instrument or demand for which the judgment is confessed, or in any other respect be not a substantial compliance with the requirements of the statute, the judgment is *ipso facto* fraudulent and inoperative against creditors.—Per GREEN, C. J.

5. In a case where a judgment is confessed for more than is then honestly due and owing, if there is actual fraud, involving moral turpitude on the part of the plaintiffs, the whole judgment should be set aside and declared void; but if the judgment is only constructively fraudulent, the court will do justice between the parties, and will hold the judgment good for what was due and owing when it was confessed, and will set it aside as to the excess.—Per POTTS, J.

6. Where a judgment is confessed in part to secure a debt then honestly due and owing, and in part to secure future advances, and such advances are afterwards made according to agreement, the court will not infer that an actual fraud, involving moral turpitude, was intended at the time the judgment was confessed.—Per POTTS, J.

In error to the Supreme Court.

*C. Parker* and *F. T. Frelinghuysen*, for plaintiffs in error.

*J. P. Bradley* and *P. D. Vroom*, for defendants.

Benjamin Parkhurst confessed a judgment to Henry G. Ely, Dewitt C. Clapp, and Edward E. Bowen, partners, trading as Ely, Clapp and Bowen, for the sum of ten thousand dollars. Of this sum, $3052.94 was actually due and owing from Parkhurst to the plaintiffs at the time the judgment was confessed, and for the balance of $6947.06,

Clapp v. Ely.

the plaintiffs gave Parkhurst their note, with the understanding that the note should be paid in goods and cash, as the defendant should require. The judgment was entered in the Supreme Court, November 4th, 1853, and execution was issued thereon. Soon after the confession of this judgment, the defendant confessed judgments to other parties, and executions were issued upon them also. Under all the executions, levies were made on the defendant's personal property, which was sold by the sheriff, and produced the sum of $7951.10. On application in behalf of the junior judgment creditors, the Supreme Court ordered the money to be paid to the clerk of that court; and a rule was granted to show cause why the money should not be applied to the junior judgments, to the exclusion of the first judgment. This brought before the court the question whether the judgment of Ely, Clapp and Bowen was a valid judgment, or whether it should be declared unlawful and void as against subsequent judgment creditors. The two justices of the Supreme Court before whom the cause was argued, decided that the first judgment was valid, and ordered that the money should be paid to the plaintiffs therein. The cause was removed into this court on writ of error, brought by Wellington Clapp and others, junior judgment creditors.

The facts in the case and the points presented to the court fully appear in the report of the case in the Supreme Court (1 *Dutcher* 188) and by the opinions delivered in this court.

The cause was argued in this court before all the judges, except the two who heard it in the Supreme Court. Before a decision was rendered, two of the judges, who heard the argument, went out of office, and a re-argument was ordered.

The second argument was at November Term, 1857, and was before twelve judges, being all the judges of the court who were competent to sit, and all except the two who gave the judgment in the Supreme Court. The

cause was held under advertisement until March Term, 1858, when the following opinions were delivered :

The CHIEF JUSTICE. On the 4th of November, 1853, a judgment was entered by confession in the Supreme Court, in favor of Ely, Clapp and Bowen against Benjamin Parkhurst, for $10,000, upon a promissory note, given on the day the judgment was confessed. At the time the judgment was confessed, there was due from the defendant to the plaintiffs in the judgment, according to the plaintiffs' own claim, but $3052.94. For the balance of the judgment, $6917.06, the judgment was confessed, upon an agreement that that amount should be subsequently advanced by the plaintiffs to the defendant, and the design of the judgment was to cover and secure such future advances. The affidavit made by the plaintiffs on entering the judgment states the true consideration of the note on which the judgment was confessed to be goods sold and money lent by the plaintiffs to the defendant. There is no dispute as to these facts; they are admitted by the plaintiffs in the judgment.

The questions now presented for consideration are—1st. Is such judgment valid by the laws of this state, as against subsequent *bona fide* creditors of the defendant? 2d. If it is not, may the plaintiffs in error, who are *bona fide* creditors, have relief against that judgment?

The answer to these questions depends upon the true construction and legal effect of a statute of this state, to be found in *Nix. Dig.* 59, § 5. The provision is now incorporated in the act directing the mode of entering judgments on bonds with warrants of attorney to confess judgments, but originally it constituted no part of that act. It was first passed on the 29th of January, 1817, (*Pamph. L.* 16) and was entitled "An act to prevent the fraudulent confession of judgments."

By the first section of that act, it is enacted "that *no judgment* shall be entered up *in any court of record* of this

state on a warrant of attorney for confessing such judgment, unless the plaintiff or his attorney shall produce, at the time of confessing the judgement, to the court or judge before whom the judgment is confessed, an affidavit of the plaintiff, his attorney or agent, of the *true cause of action*, and that the debt is *bona fide* and *justly due and owing* to the person or persons to whom the judgment is confessed, and that the said judgment is not confessed to answer any fraudulent purpose, or to protect the property of the defendant from his creditors." (The phraseology of this section has been since modified, in certain particulars, to render it more effective, which will be hereafter noticed.)

By the *second* section it is enacted that when parties agree to enter without process any action *before a justice of the peace*, in the court for the trial of small causes, no judgment shall be entered against the defendant, unless an affidavit shall be made, as prescribed in the first section of the act, and filed with the justice.

In looking for the true interpretation of this statute, is is obvious to remark that the terms of the act are clear. Whatever doubts legal ingenuity may suggest—whatever difficulties common law learning and technical rules may interpose in carrying the act into execution—there can be no doubt as to the intent of the legislature. They intend that *no judgment* should be entered up by confession, even for a note or bond, unless founded on a real consideration and on a *bona fide* debt justly due and owing, untainted by fraud, and not prompted by a design to protect the defendant's property from his honest creditors; and that those facts should be verified by oath before the judgment should be entered. They intended, as they have plainly declared, that no judgment should be entered up in any court of this state, unless the affidavit therein prescribed was made. They intended, moreover, that the facts required to be verified by affidavit should actually exist. They did not mean to suppress fraud, by offering

a bounty for the commission of perjury. Such is the fair and natural import of the language of the act. Such is the impression it must make upon every candid mind unembarrassed by legal technicalities.

It is important to observe that this is not a *practice act*— not an act directing the *mode* of proceeding in civil actions, or the *form* of entering judgments by confession. It deals with substance, not with form—with the reality, and not with the shadow. It is, by its title, declared to be " An act to prevent the fraudulent confession of judgments." Like every other act for the suppression of fraud, it is entitled to receive a liberal construction at the hands of the court, so as most effectually to suppress the mischief, and advance the remedy.

Again, the language of the act is not merely *directory*. It does not direct that, in entering judgments, an affidavit shall be made; but its terms are prohibitory : " no judgment shall be entered," unless such affidavit be made. Terms which are not regarded as directory, and which cannot be lightly disregarded or evaded.

If, upon the terms of the act, there be room for doubt as to its true meaning, we are then to look to the reason of the law, and to the mischief which it was designed to remedy. At common law, a judgment by confession was valid without an affidavit. It might be entered to secure future advances. It might be confessed without any consideration whatever, though no debt was due, or ever to become due. As between the parties, such judgments were valid; and where they were fraudulent as against creditors, relief could ordinarily be had only by resort to the expensive and dilatory process of a bill in equity. These judgments by confession, therefore, afforded the most facile and effectual mode of perpetrating fraud. And in seasons of great financial embarrassment, like that which followed the close of the last war with Great Britain, and which existed at the passage of this act in 1817, resort was very extensively had to confessed judg-

ments, as a mode of protecting property from the hands of creditors. This evil the legislature, by the act in question, designed to remedy, by declaring that *no judgment* by confession should be entered in any court of this state, except upon a *real consideration* and for a *bona fide* debt justly and honestly due and owing. In this particular the legislature intended to change, and have changed, the rule of the common law. They intended to change it, because the common law practice was the common refuge and the shield of fraud.

But the legislature not only prohibited the entry of any judgment by confession, except upon a real consideration and for a *bona fide* debt, but they required that the plaintiff in the judgment should, under oath, disclose the true consideration of the judgment, and place it upon record, in order—1. That the court might judge whether there be a legal consideration for the judgment. An ignorant party might believe, or an ingenious or unscrupulous attorney might advise, that there was a legal consideration, when none existed in fact. 2. The true consideration was required to be disclosed upon oath, and to be placed upon record for the more important reason that the *bona fide* creditors of the defendant might see and know what the consideration of that judgment was, without being driven into a Court of Chancery for a discovery. Fraudulent judgments, designed to cover the defendant's property, are ordinarily confessed to confidential creditors, friends, or relatives, under circumstances which render a discovery essential to the vindication of justice. The uncertainty, expense, and delay incident to a bill in equity for a discovery would naturally deter any small creditor from venturing upon the experiment. The legislature designed, therefore, by the act, to furnish, upon the face of the proceedings, that discovery to every creditor without a resort to equity. A judgment, therefore, entered by confession without the existence of a *bona fide* debt, or without an affidavit disclosing the true consideration of the

judgment, is in direct contravention of the spirit of the law and the clear intent of the legislature.

If there still be any doubt as to the true construction of the act, it is important to resort to cotemporaneous exposition. It is a dictate of common sense, as well as a sound rule of law, that in construing a statute, regard should be had to the light in which the statute was received and held at the time of its enactment. Great regard (says Lord Coke) ought, in construing a statute, to be paid to the construction put upon it by those who lived about the time the law was made, because they were best able to judge of the intention of the makers at the time of making it. *Contemporanea expositio est fortissima in lege. Dwarris on Stat.* 693.

Fortunately we are not left in doubt as to the construction put upon this act immediately after its passage. The act was passed in January, 1817. It contained two sections, the one applying to *courts of record,* the other to *justices' courts;* but in other respects the sections are identical. It is material to call attention to this fact, because the two sections were subsequently severed, the one being inserted in the act relative to the confession of judgments on bonds with warrants of attorney, and the other introduced, with alterations, into the act constituting courts for the trial of small causes.

The question upon the construction of the statute which we are now considering arose immediately after the act went into operation, and was decided by the Supreme Court, in *Parker* v. *Griggs,* 1 *South.* 161.

In October, 1817, a judgment was confessed in a justice's court, the suit having been commenced without process, and no affidavit made, as prescribed by the act. A *certiorari* was brought to reverse the judgment, in the name of the defendant, but in reality for the benefit of the sureties on his bond for the prison limits.

Mr. Scott, arguing for the plaintiff in *certiorari,* objected that the plaintiff in the judgment had not made and filed

with the justice an affidavit, as required by the statute. He had not done that which was necessary to authorize the justice to enter a judgment upon the confession. The proceeding therefore, as he insisted, was altogether void.

Mr. Wood, for the defendant in *certiorari*, said that the statute was made for the benefit of creditors only, and not of the party to the fraud, the debtor himself; that it was a mere enlargement of the law against fraudulent judgments, which operated only in favor of creditors; that it made a judgment entered in this way *ipso facto fraudulent (not void)*; and that, having thus determined the character of the judgment, it left it to the same construction and operation as every other of the same character; that the design of the statute was proved by the affidavit being required; that although there was evidently error in this proceeding, and error of which creditors might avail themselves, yet that the defendant in the judgment could not take advantage of his own wrong.

Chief Justice Kirkpatrick, in delivering his opinion, said— " The only question which presented itself upon this case being moved at the bar was, whether *the party* himself confessing the judgment could assign the want of the affidavit for error. But upon a little reflection, there can be no doubt upon that head. The words of the statute are *peremptory*. The judgment is fraudulent.

Rossell, J., was of the same opinion.

Southard, J., said the words of the statute are extremely plain and explicit. No judgment by confession against the defendant shall be entered, unless an affidavit, &c. But one construction can be put upon it. The affidavit is absolutely necessary to give the justice the power to enter a judgment. His proceeding without it is a perfect nullity; it is altogether void. It is not merely void against creditors, &c.; * * * there is no right to enter a judgment; and if entered, it is valid against no one. If a proceeding thus void be presented to this court, it must be set aside. But can the defendant himself, who has

confessed the judgment, object to it? I see no reason why he may not. It was conceded that the want of the affidavit rendered the judgment fraudulent. The only question made was, whether the defendant could raise the objection.

One of the counsel agreed, and one of the judges held the judgment to be *ipso facto void*. The other counsel and two judges agreed that the judgment, for want of the affidavit, was *ipso facto* fraudulent. No one pretended that the judgment was valid or effectual against a creditor.

The question next came before the court in *Cliver* v. *Applegate*, 2 *South.* 479. The parties were both constables; each had an execution against the same defendant. Applegate held the eldest execution and levy; but the judgment on which it issued was entered by confession without affidavit. Cliver had the younger execution; but he seized and sold the goods. Applegate thereupon sued him, and recovered a verdict. The judgment was removed into the Supreme Court, and was there decided, in February, 1819. Mr. Justice Southard held, as he did in Parker *v.* Griggs, that the judgment, being entered without an affidavit, was directly opposed to the provisions of the act to prevent the fraudulent confession of judgments. It was, therefore, by virtue of that act, *void*, not a valid judgment.

Kirkpatrick, Ch. Just., said—I am not willing to go so far as my brother Southard has gone in this case, and to say that the judgment is *void*. The act to prevent the fraudulent confession of judgments does not say so. * * * But yet that judgment is not only irregularly and unlawfully entered, but, upon a fair construction of the act, it may be considered as fraudulent also, and therefore in its very nature *void* as against *bona fide* creditors.

This case had been tried by a jury, who found in favor of the judgment, and that there was no fraud in fact. The Chief Justice says this verdict is founded in mistake; for the plaintiff, on the trial, having admitted that the

judgment upon which the execution was issued had been entered without the necessary affidavit, the jury were bound by that admission; and *such a judgment being in construction of law fraudulent,* they ought so to have found it. And whether the law upon this subject was declared and given them in charge by the justice, or they undertook to decide it for themselves, makes no difference. Still it is a verdict against law, and upon this ground the judgment must be reversed. Rossell, J., concurred in the reversal, on the ground that there was no valid judgment in favor of Johnson.

In this case, again, the court concur in holding the judgment inoperative against creditors. They differ only in this, that one holds the judgment, for want of the affidavit, *ipso facto* void; the other, that it is fraudulent and void only as against *bona fide* creditors.

In one of these cases, it will be observed that a judgment by confession without affidavit was reversed at the instance of the defendant in the judgment; in the other case, the judgment was held inoperative and void as against a subsequent *bona fide* execution creditor.

These cases of Parker *v.* Griggs, and of Cliver *v.* Applegate, ten years afterwards, were cited with approbation by Mr. Justice Ford, while delivering an opinion in the Supreme Court; and it was said by him that they had fully settled the law that a judgment entered by confession without affidavit was, if not absolutely void, fraudulent and inoperative against creditors. *Sheppard* v. *Sheppard*, 5 *Halst.* 252.

It has been suggested that these decisions apply only to the court for the trial of small causes. But the same statute and the same provisions applied to all courts; and I am aware of no distinction, except that, in one case, the law may operate upon a laborer with a judgment for $50, and in the other upon a merchant with a judgment for $10,000. The question involved is precisely the same in both cases.

Clapp v. Ely.

We have, then, the cotemporaneous exposition of this statute by judges who were living when the act was passed, made immediately after it went into operation, that a judgment entered without the affidavit prescribed by the statute was not merely *irregular* or *erroneous*, but that it was fraudulent and void as against *bona fide* creditors. There was doubt whether the *defendant* could avail himself of the error, but all agreed that the rights of *bona fide* creditors could not be prejudiced by such judgment.

The judgments rendered in these cases were never reversed. The principle maintained by them, so far as relates to the rights of creditors, continued the unquestioned law of the state, recognized and constantly acted upon by bench and bar, for at least nineteen years after the passage of the law. The rights of creditors under the act of 1817, and the duty of the courts to maintain those rights, were in fact never doubted till learned judges, entangled in the meshes of technical difficulties, and apprehensive of violating the forms of the common law, were tempted to disregard the plain injunctions of the statute.

Having thus examined the cotemporaneous judicial construction of the act, it is instructive to notice what interpretation the legislature themselves put upon it. Immediately after the passage of the act of 1817, judgments which were confessed in justices' courts without affidavit were, as we have seen, set aside by the Supreme Court, at the instance of the defendants themselves, as being in violation of the act. The legislature, to avoid this result, on the 12th of February, 1818, repealed the 2d section of the act of 1817, which enacted, that no judgment should be entered without an affidavit first made and enacted, that unless the affidavit required by the act was first made, "a judgment by confession before a justice, on suit without process, shall not operate or have any effect against any person or persons not parties in the action, but shall

be binding and have its full effect, so far as relates to parties in the suit only." This was the manifest spirit of the act of 1817, and the alteration was designed to carry into effect what was intended by that act. It declared the judgment valid as against the defendant, but inoperative as against other parties. It estopped the defendant from setting aside a judgment confessed by himself, by taking advantage of a statute designed to protect creditors against his own fraudulent act. This was precisely what Mr. Wood, in his argument as counsel in Parker *v.* Griggs, contended should have been the construction of the act of 1817. But the court thought that the language of the act was too explicit; and although it was seen that it was never intended that the defendant should avail himself of the want of the affidavit, yet they felt constrained by force of the statute, even as to him, to set the judgment aside. This act of 1818 is but a legislative interpretation of the act of 1817, and an embodiment of the real spirit and policy of that act. The legislature never intended that a different rule should prevail in different courts, nor to enact that a judgment entered before a justice without affidavit should be invalid, while a similar judgment in the higher courts continued valid as against creditors. The reason for the change was, that by the act of 1817, the judgment without affidavit was invalid against the defendant as well as against creditors.

The act of 1817, requiring that the plaintiff, on entering the judgment, should make affidavit of the *cause of action* being evaded, and the design of the act defeated, by the plaintiff's making affidavit that the instrument on which the judgment was entered was the cause of action, (see *Burroughs* v. *Condit,* 1 *Halst.* 300,) in 1820 the act was repealed, and a new act passed requiring the party to swear to the *true consideration* of the bond or obligation. This act was limited in its operation to judgments confessed on bonds with warrants of attorney to confess judgment. It required no affidavit where judgment was

confessed in any other mode. The policy of this statute was utterly defeated by judgments being confessed according to the forms of the common law, wherever the affidavit required by the statute could not safely be made. The legislature, therefore, in 1829, (*Harr. Comp.* 248,) again extended the law requiring an affidavit on entering all judgments by confession, thus virtually restoring the act of 1817. The act of 1829 is in fact the revival, as to all courts of record in the state, of the act of 1817, with additional guards against subterfuge and evasion. It is worthy of special notice, that prior to the act of 1829, which is now in force, the construction of the act of 1817 had been settled by repeated adjudications. The courts had decided that a judgment entered without affidavit under that act was fraudulent and void against *bona fide* creditors. That construction had never been questioned. It had been repeatedly acted upon under the act of 1820. The legislature, therefore, must be taken to have passed the act of 1829 in view of the construction uniformly given to the act of 1817, and by reviving that act, to have designed that a judgment entered up without the affidavit prescribed by the act should be inoperative as against creditors.

We have, then, the plain language of the act itself, the cotemporaneous exposition of the statute by the Supreme Court, the legislative interpretation by the act of 1818, declaring that a judgment without the affidavit should be inoperative, except as against the parties to the suit, and the act of 1829, reviving the act of 1817, in full view of the construction put upon it by the court—all concurring in the conclusion that a judgment entered without the *affidavit prescribed by law* is *ipso facto* fraudulent and void as against *bona fide* creditors.

And whether there be no affidavit, or the affidavit filed be substantially defective and variant from the requirement of the act, is totally immaterial. The ground of the objection is, that the judgment is entered in violation of

the statute and in contravention of the policy of the law. An affidavit not according to the act is the same thing as no affidavit. *Sheppard* v. *Sheppard*, 5 *Halst.* 252.

The learned judge by whom the opinion in this case was delivered in the court below, assents to the proposition that if there be no affidavit, the judgment is fraudulent and void as against creditors, but holds that if the affidavit is defective, the same conclusion does not follow. And it is argued in this court, that the absence of the affidavit affords only presumptive evidence of fraud. But this is placing the objection on totally erroneous ground: neither a defective affidavit nor the absence of an affidavit affords the least evidence of fraud in fact. In most of the reported cases there is no suggestion or pretence of actual fraud; the defect has arisen from inadvertence, ignorance, or accident. In the case of Cliver *v.* Applegate, the jury found there was no fraud; but the court said the verdict was against law. The judgment was fraudulent as against creditors by force of the statute. The term fraudulent is in fact not strictly appropriate; the real objection is, that the judgment, being entered against the prohibition of the statute, is unlawful, and therefore inoperative against creditors. It may be reversed by the defendant himself, not because it is fraudulent, but because it is unlawful.

But, admitting the judgment to be unlawful, can creditors of the defendant avail themselves of the objection? The statute was passed for the protection of *bona fide* creditors, and it seems a strange anomaly to assert that they cannot avail themselves of a statute passed expressly for their benefit. In the early exposition of the statute, it was, as we have seen, universally conceded that creditors could avail themselves of the provisions of the statute. The only doubt was, whether the defendant, who was himself a party to the fraud, against whose fraudulent act the statute was designed to guard, and who, if there be fraud, is necessarily a party to it, should be permitted to raise the objection. But, after the lapse of forty years,

we are to be brought to the conclusion that the statute is a perfect shield to the party committing a fraud, but will afford not the least protection to the party defrauded, and who was designed to be protected by the statute.

The courts of the state, for a long period after the passage of the act, were in the constant practice of examining the validity of judgments by confession, at the instance of creditors, on the ground that the affidavit was defective, or that the judgment was otherwise invalid. It was a familiar and unquestioned exercise of power. The reported cases are numerous. *Cliver* v. *Applegate*, 2 *South.* 479; *Woodward* ads. *Cook*, 1 *Halst.* 322; *Warwick* v. *Matlack*, 2 *Halst.* 165; *Scudder* v. *Coryell*, 5 *Halst.* 340; *Latham* v. *Lawrence*, 6 *Halst.* 322. And the principle upon which the court interferes on behalf of the creditor was examined and sanctioned in *Read* v. *Bainbridge*, 1 *South.* 351; *Milnor* v. *Milnor*, 4 *Halst.* 93. But it seems to have been considered by the court below that all the previous decisions upon the statute, and the settled course of practice under it, were overturned, and a contrary doctrine established by the two cases of Evans *v.* Adams and Hoyt *v.* Hoyt.

In *Evans* v. *Adams*, 3 *Green* 373, (decided at September Term, 1836, nearly twenty years after the statute had been in operation,) the doctrine was first formally announced, that a judgment creditor could not, upon motion, contest the validity of a judgment entered up by confession in violation of the statute requiring an affidavit to be made. A judgment had been entered upon bond and warrant of attorney to confess judgment in the Hunterdon Pleas in favor of Evans and against Adams. The Common Pleas, at the instance of subsequent judgment creditors of Adams, set aside the judgment, on the ground that the affidavit upon which the judgment was entered was substantially defective. No objection was made in that court to the right of the creditor to test that question. The plaintiff below, whose judgment had been set aside,

brought a writ of error. Two questions were discussed by counsel at bar, *viz.*—1, whether a writ of error would lie; and 2, whether the court below erred in holding the affidavit defective. Mr. Justice Ford held that no writ of error would lie; and he confined his opinion solely to that point, concluding that the writ of error should be quashed. The Chief Justice and Justice Ryerson held that the writ of error would lie; and the only remaining question was whether the Court of Common Pleas had erred in holding that the affidavit was deficient. The Chief Justice held that the affidavit was a substantial compliance with the statute. He examined the question in the light of the decision in Latham *v.* Lawrence, and held, upon the principles of that case, that the affidavit did disclose the true consideration of the bond; and upon that point Mr. Justice Ryerson concurred.

But the Chief Justice went further, and decided that the creditor had no right to be heard in the court below upon an objection to the validity of the affidavit. That Mr. Justice Ryerson did not concur in this opinion, is apparent from the clear expression of a directly contrary opinion in the subsequent case of Hoyt *v.* Hoyt. The view of the Chief Justice upon this point was but the individual opinion of a single judge, entitled, it is conceded, to very great respect, but not a determination of the court, and not, therefore, an authoritative adjudication upon the point.

Mr. Justice Drake, who had just left the bench of the Supreme Court, and who heard and decided the cases of Scudder *v.* Coryell and of Latham *v.* Lawrence, was the attorney of the plaintiff in the case of Evans *v.* Adams, and argued the case both in the court below and in the Supreme Court. He did not, in either court, raise the point thus decided by the Chief Justice. No such ground was assigned for error, nor was the point alluded to in the brief of counsel upon either side. The point was raised upon the motion of the learned Chief Justice him-

self, and decided without argument and without the concurrence of either of his brethren.

The opinion opens with this proposition : "One judgment creditor has no right, simply because he is such, to inquire into the *regularity* of another man's judgment." "The court below, simply on the ground of *irregularity*, set aside the judgment at the instance of third persons, who, for aught that appears, had no interest in the matter. But admitting that it stood in the way of their execution, the creditors could not bring a writ of error upon that judgment ; and for the same reason, they could not, on motion, inquire into the regularity of the judgment." The whole opinion proceeds upon the assumption that the want of an affidavit is a mere *irregularity*, or technical error, of which, upon common law principles, only a party or privy to the record could avail himself. Admitting the premises, the conclusion may be perfectly sound. But the real question lay back of that. Was the want of the affidavit prescribed by the statute a mere irregularity ? It had never been so regarded. Eighteen years before, immediately after the passing of the act, it had been held, as we have seen, by the Supreme Court, that the want of the affidavit rendered the judgment fraudulent. It had been decided, in the emphatic language of Chief Justice Kirkpatrick, that a judgment entered up in violation of that statute was not only irregular and unlawful, but fraudulent, and in its very nature void as against *bona fide* creditors. And though a jury had found there was no actual fraud, yet the verdict was set aside as against law, on the ground that the want of the affidavit rendered the judgment, in construction of law, fraudulent. These decisions are in no wise alluded to in the opinion of the learned Chief Justice. They had been the recognized law of the state from 1818 till 1836. They had never been questioned by the bench, much less reversed. They had been accepted, and acted upon by bench and bar as valid law. Both in the Supreme Court and in the

Courts of Common Pleas, the power of setting aside judgments by confession, at the instance of creditors, for defective affidavits, had been constantly invoked and exercised. It may be affirmed, without fear of contradiction by any counsel familiar with the legal history of that day, that it was as familiar an exercise of power as the laying out of highways. If the universal concurrence of bench and bar in a rule of law, and a constant exercise of power by the court in pursuance of such rule without question, be evidence of its existence, it was clearly settled prior to the case of Evans v. Adams, that the want of the affidavit required by the statute was a matter of substance, and not a mere irregularity, and that it rendered the judgment constructively fraudulent, as against the letter and spirit of the law.

In Evans v. Adams, the opinion of Justice Ford in Scudder v. Coryell is cited as a full and lucid exposition of the law, that a creditor could not, upon motion, inquire into the regularity of a judgment entered by confession. But did Justice Ford decide that the want of an affidavit was a mere irregularity? In the subsequent case of Latham v. Lawrence he concurred in holding that a judgment by confession was properly set aside at the instance of creditors, on the very ground of a defective affidavit.

In the case of *Scudder* v. *Coryell*, 5 *Halst.* 340, application was made, on behalf of subsequent judgment creditors, to set aside several judgments by confession entered on bond and warrant of attorney. A variety of exceptions were taken, principally to the form of the proceeding, as that the copy of the bond and warrant was on two half sheets, and not on a whole one; that there were erasures and interlineations in the copies, and that the affidavit was not in all respects formal. The exceptions were examined in detail by the Chief Justice, and pronounced invalid. He treated the defects relied on as defects of form, which could not invalidate the judgment without questioning the creditor's right to raise the objection.

Clapp v. Ely.

Mr. Justice Ford, after stating that objections are taken to the judgments because they are not entered in strict conformity to the mode directed by the statute, adds that these present no grounds for setting aside judgments on the application of third persons. He then proceeds to combat the idea that the power of entering up judgments at chambers is a special delegated statutory authority which must be strictly complied with, and contended that the power of entering judgments was a common law power, and that the statute was the regulation of an existing power, not the introduction of a new one. To do justice to Judge Ford's views, it is proper to state, as matter of history, that at, and long prior to the date of that opinion, it had been matter of doubt among practitioners whether the first three sections of the act of 1798, directing the mode of entering judgment on bonds and warrants of attorney, were to be regarded as merely directory, or whether they were not to be regarded as conferring special powers, and therefore to be strictly pursued. The embarrassment was increased by the 4th section of the act which was passed in 1820. The point was raised, and urged by Mr. Vroom, as counsel in *Den* v. *Zellers*, 2 *Halst.* 153, and it was insisted that a departure from the form prescribed utterly avoided the judgment. And it may be mentioned, as a striking illustration of the general prevalence of that sentiment at the bar, or at least of a doubt as to the true construction of the act, that among the numerous judgments on file in the clerk's office of the Supreme Court, from 1798 down to the decision in Scudder *v.* Coryell, scarcely one can be found which is not written upon a whole sheet of paper, and otherwise prepared in strict conformity with the directions of the act. It was this idea that Judge Ford was combatting; but he had, it is believed, no reference to that clause of the statute which required the affidavit to be made. This same view was taken by Chief Justice Kirkpatrick in *Den* v. *Zellers*, 2 *Halst.* 160. He said, "the judgment offered in

evidence at the circuit was not void, but voidable only. It was a subject of which the judge had cognizance. The authority to enter judgment in vacation was not a new authority; it was an old common law authority, and the statute only came in to regulate the matter." The statute, as to these particulars, was directory. But the Chief Justice, in Scudder v. Coryell, surely did not mean to say that the affidavit was a formal matter, and that its absence was no ground of impeaching the judgment by other creditors. He had decided, more than once, that the affidavit was essential to the validity of the judgment, and that without it the judgment was fraudulent. He never could have intended that the affidavit was a matter of form, or that its absence was not fatal to the judgment. Nor do we apprehend that Judge Ford so intended. He said—"none can take advantage of these *defects in form* but the parties themselves, and that courts of justice never allow judgments to be impeached for irregularity or want of form by third persons." He was speaking of the formal directions of the statute and of mere formal objections to the affidavit—of the same class of objections which the Chief Justice had pronounced unavailing, and which were met by that clause of the statute which declared that no judgment entered upon the statute should be reversed for defect of form.

In the case of *Hoyt* v. *Hoyt*, 1 *Harr*. 138, Chief Justice Hornblower reiterates the opinion, expressed by himself in Evans v. Adams, that a creditor will not be permitted, on motion, to assail a judgment by confession for defect of affidavit. He takes another step, and holds that although the judgment be entered in direct violation of the statute, yet if there be no actual fraud, the court will not interfere at the instance of the creditor, either by avoiding the judgment or by postponing the execution to the claims of subsequent execution creditors. Notwithstanding this opinion, he proceeds to examine the case upon the merits, and holds that the judgment of the Pleas must be reversed,

Clapp v. Ely.

on the ground that the case was within the statute, and the judgment regularly entered. Mr. Justice Ford is reported as concurring, but upon which ground does not appear. Mr. Justice Ryerson also concurs in the reversal of the judgment, but he dissents in the strongest terms from the views of the Chief Justice. "I take it," he says, "to be an unquestionable position, that unless the affidavit *truly* in substance specify the consideration of the bill, bond, deed, note, &c., for which the judgment shall be confessed, the proceeding is void, or may be declared void as against creditors."

Neither of the cases upon which the court below rely decides the point now at issue, viz., that a judgment entered upon a defective affidavit will not be set aside at the instance of a creditor. In Evans *v.* Adams it is clearly the individual opinion of a single judge, and in Hoyt *v.* Hoyt it is doubtful whether Justice Ford assented; and it is certain that Justice Ryerson, in the strongest terms, dissented. Neither case was decided on that ground; neither case is a judicial determination of that question. In both cases the validity of the affidavit was looked into and decided by the court at the instance of a creditor, notwithstanding the individual views of the Chief Justice. In fact, since the passage of the act, no reported case can be found where a court has refused to examine and decide upon the validity of the affidavit at the instance of a creditor.

The utmost that has ever been decided will be found in *Black* v. *Kirgan*, 3 *Green* 45, where it was held that a creditor cannot bring a writ of error; because, upon common law principles, no one but a party or privy to the record can bring error. The whole objection rested upon a mere technical difficulty at common law. And then, assuming that the act requiring the affidavit was merely directory, and consequently that its omission was a mere irregularity, the Chief Justice was led to the conclusion that the creditor had no right to complain, as his rights were

not affected by it; overlooking the cardinal fact that the act was passed for the suppression of fraud and for the protection of creditors, and that the making of the affidavit was prescribed by the legislature as the only condition upon which even an honest creditor can enter a judgment by confession.

This court cannot overlook the extraordinary condition in which the law upon this point will stand if the judgment in this case be affirmed. It is clear that this provision was made for the protection of creditors. The affidavit is required in all cases of entering judgment by confession. In the court for the trial of small causes, if the affidavit be defective, the judgment, by the express terms of the statute, is valid against the defendant, but void as against creditors. In the higher courts, if the affidavit be defective, the judgment, by judicial construction, is held void against the defendant, but valid as against creditors.

And not only is there this direct antagonism in the law, as it is administered, but it is obvious that the law, as applied in the higher courts and to large claims, where protection against fraud is the more essential, is rendered a dead letter. It is totally inoperative for the suppression of fraud. The law may be violated with impunity. All mode of enforcing it is denied. The doors of courts of justice are closed against the appeals of creditors. They are denied the right of availing themselves of the aid of a statute designed especially for their protection. The creditor has no other remedy than the common law affords, viz., to prove, that most difficult of all things, the existence of actual fraud. The design of the legislature is as effectually defeated as if the law were erased from the statute book.

This case was decided by the court below upon the supposed authority of previous decisions. There was a misapprehension of what those decisions were. The clear weight of authority is the other way.

But whatever may be regarded as the weight of authority, or the result of the conflicting opinions in the Supreme Court, the question is now, for the first time, presented for the consideration of this court, and a fitting opportunity is offered to declare the true construction of the statute.

In order to render the statute operative, and to carry into effect the clearly-expressed design of the legislature to prevent the fraudulent confession of judgments, it must be held—

That, under the laws of this state, no judgment by confession can be entered, except for a demand founded on a legal consideration, and for a debt justly and honestly due and owing at the time of the entry of the judgment.

That the affidavit required by the statute is a prerequisite to the entry of the judgment, and essential to its validity.

That, if no affidavit be made, or, if the affidavit do not in substance specify the true consideration of the instrument or demand for which the judgment is confessed, or in any other respect be not a substantial compliance with the requirement of the statute, the judgment is *ipso facto* fraudulent and inoperative against creditors.

That creditors whose rights are affected may contest the validity of the judgment, and to this end may show that the judgment has been entered in violation of the statute.

Upon this issue, it is immaterial whether the judgment be or be not fraudulent in fact. The simple inquiry is, do the facts exist which alone authorize the entry of the judgment? Have the requirements of the statute been substantially complied with?

In the language of Justice Ogden, in *Reading* v. *Reading*, 4 *Zab.* 362, " the judgment may have been confessed for an honest debt, and no actual injustice may have been done by it to the defendant or to his other creditors; yet, as the

legislature, in seeking to secure fairness, honesty, and good faith in such transactions, in their wisdom, have directed upon what conditions alone an honest creditor can exercise his common law right of securing a just debt by a judgment, this court, when called upon to act, must, *ex debito justitæ*, see that the requirements of the statute are not evaded or misunderstood."

Applying these principles to the present case, can this judgment be maintained? Was the debt for which the judgment was confessed justly and honestly due and owing? Did the plaintiff's affidavit state the true consideration of the instrument of writing or demand for which the judgment was confessed?

According to the plaintiff's own claim, (and in examining the case, I shall confine myself exclusively to facts admitted by them,) they had a demand against Parkhurst, the defendant in the judgment, for about $3000. They came to Newark for the purpose of receiving that debt. An arrangement was made that a judgment should be confessed. It was a subject of negotiation whether that judgment should be confessed for $10,000, or $15,000, or $20,000. It was finally settled that the judgment should be given for $10,000. Of that amount, $3000 was to secure the debt then due; the remaining $7000 was to stand as a security for future advances, in money or goods, to be made by the plaintiffs, as it should be needed or called for by the defendant. Was that $7000 then a subsisting debt? Was it a debt justly and honestly due and owing? Did the mere agreement to furnish goods, or advance money at a future day by the plaintiffs, create a subsisting debt on the part of the defendant?

It is said that a judgment at common law may be confessed to secure future advances. Admit it. A judgment, in other words, may be confessed to secure a debt to be subsequently created. It constitutes a *valid consideration* on which the judgment at common law may be founded, but does it create a *subsisting debt*, as required by the

statute? Does the debt exist till the goods are delivered or the money is advanced? And if the goods are never delivered, does the debt ever arise? Would the plaintiff be suffered to collect one farthing upon the judgment until the defendant had received the promised consideration? And if an attempt were made to enforce the judgment by execution, might not the defendant truly swear that nothing whatever was due or owing upon it—that it was intended as a mere security?

The mere formality of giving the note at the confession of the judgment does not in the least vary the case. It was the mere process of perfecting the security. It did not vary the transaction in substance. It was in fact immediately returned to, and held by the attorney of the plaintiffs. It is impossible to disguise the fact that when the judgment was confessed (as to the $7000) nothing was due.

The judgment was to stand as a mere security for future advances. The debt did not arise till the advances were made. Whether there would ever be an indebtedness or not, depended upon a future contingency. There was no subsisting debt due, or to become due, when the judgment was confessed.

The case does not fall within the principle of Hoyt v. Hoyt, nor is at all supported by the authority of that case, admitting it to be sound law. In that case there was an actually subsisting debt. The consideration was executed. The plaintiff had given his note to a third party in actual payment of a debt of the defendant. It was held tantamount to money lent; and if the holder of the note accepted it as such, there was certainly no injustice in so treating it. The note was not made for the purpose of playing a part in the confession of the judgment, but was a valid *bona fide* transaction, by which the debt of the defendant was actually paid, and the liability of the plaintiff was absolutely fixed.

But, again, does the affidavit state the true considera-

Clapp v. Ely.

tion of the judgment, as required by the statute? One great object of the statute, in requiring that the consideration should be disclosed, was, as has been said, that the court might see that there was a valid consideration, and that the creditors might know the truth, without resort to a bill of discovery.

In this case the true consideration is not stated. The consideration was not money lent; it cannot be so held by the broadest and most liberal interpretation. The true consideration of the judgment was a security for future advances. Had that been disclosed, the design of the judgment would have been defeated. It would have appeared upon its face that it was valid only to the amount of $3000. It is paltering with the statute to make the validity of the judgment depend upon the honesty of the party or the integrity of the attorney; upon the question whether the failure to disclose the true consideration was honest or corrupt. It is totally immaterial whether it was the result of mistake, ignorance, or design. The simple inquiry is, was the requirement of the statute complied with? To this inquiry there can be but one reply.

It is impossible to conceive of a case which illustrates more strongly the wisdom of the statute, and the importance of enforcing it, than the present; none which shows more clearly the facility with which, by means of confessed judgments, property may be covered up from the claims of honest creditors, and the plausible pretexts by which it may be defended.

The plaintiffs were wholesale merchants in the city of New York. The defendant, Parkhurst, was a retail merchant, carrying on business in Newark. At the time of the confession of this judgment he was deeply embarrassed, and his creditors were pressing for payment. He owed, at the lowest estimate, between fifteen and twenty thousand dollars. He was a customer of the plaintiffs, and in their debt about $3000. In this state of things, the plaintiffs, Ely, Clapp, and Bowen, came to Newark, as

they say, for the purpose of securing their debt. Parkhurst says that they had agreed to take a judgment for $20,000 to give him time for payment, and thus keep him on his feet. This the plaintiffs deny, and say that the defendant wanted that amount, but that they never agreed to advance it. The difference is immaterial. It is in evidence that there was a serious negotiation as to whether the judgment should be for $20,000, $15,000 or $10,000; Parkhurst, the defendant, insisting upon the largest amount. The whole transaction is too transparent to deceive any one. The design of Parkhurst was to have his property protected from his creditors. The primary object of the plaintiffs was to secure their own debt of $3000; and to effect this object, they were willing—not to lend money—not to make a *bona fide* advance, as they had a right to do—but to agree to make future advances, and to take a judgment for an amount three times beyond their debt—a judgment for an amount as large as the defendant could secure, and which effectually covered his whole property from the claims of other creditors. The terms of the contract, on the part of the defendant, was, that he would prefer the plaintiffs' debt, and become their customer in future; and, on the part of the plaintiffs, that they would, as a consideration for this advantage, take the hazard of further advances, and cover the defendant's property by means of a fictitious judgment. An affidavit is made, which, instead of stating the true consideration of the judgment, by which it would have appeared that $3000 only was due, falsely states that the consideration was *money lent*, and that the entire debt was then justly and honestly due. So far as the creditors could know, there was a valid subsisting judgment for $10,000—sufficient to cover the defendant's entire property, and to deter them from attempting to enforce their claims. There would have been no ground for suspecting the truth or attempting to impeach the judgment. The plaintiffs were men of wealth. They might well

Clapp v, Ely.

have given credit to so large an amount to a customer. The defendant was a man in business—he might naturally have incurred so heavy a debt. And the cover would have been just as effectual, if not one dollar had ever been advanced upon the judgment. A falsehood upon the record covered the real transaction, and there would have been no suspicion of its true character had the parties themselves not differed as to the fulfillment of the terms of the contract between them.

This, alone, has been the means of bringing this transaction to light. It is now fully before the court, and the question is, shall the judgment be sustained ? Is it a valid judgment, to defeat the claims of honest creditors ? If it is, then the statute is a dead letter—a mere trap to men's consciences—and the sooner it is swept from the statute book the better.

In my opinion, the judgment is entered in violation of the clear letter and spirit of the law. It contravenes the manifest policy of the statute, and is therefore illegal, fraudulent, and void as against creditors. I am therefore of opinion that the judgment below should be reversed ; that the judgment of Ely, Clapp and Bowen, and the execution issued upon it, should be set aside, and the money in the hands of the sheriff should be ordered to be paid to the other execution creditors, in the order of their priority ; that the defendants in error should pay the costs of the proceedings below, as if the order had been there correctly made in the first instance, but not the costs in this court; and that the proceedings should be remitted to the Supreme Court, to be proceeded in accordingly.

It was suggested, upon the argument, that by overturning the law, as it was understood to be held in Hoyt v. Hoyt, we should endanger titles and affect vested rights acquired under the authority of that case. Admitting that the effect of our decision is to change the law, as it has been understood, how can it affect titles ? Property sold by virtue of such judgment will vest in the pur-

chaser. The validity of the judgment cannot be inquired into collaterally. It is not absolutely void. The law upon this point is perfectly well settled. It was so held by the Supreme Court, in *Den* v. *Zellers*, 2 *Halst.* 153, and by this court, in *Den, ex dem. Vandervere*, v. *Gaston*, 4 *Zab.* 818.

More than a year has elapsed since this case was first argued in this court. If an erroneous practice had previously prevailed, ample time has been afforded to correct it. The controversy in this case, admitting that the plaintiffs have advanced every dollar they claim, is a mere struggle between two sets of creditors for priority. There never can be an opportunity of settling the principles involved more satisfactorily and with less prejudice to parties.

POTTS, J. The contest is between judgment creditors, as to the right to moneys raised by the sheriff of Essex upon executions issued on said judgments. Henry G. Ely, Dewitt C. Clapp and Edward E. Bowen, trading as Ely, Clapp & Bowen, claim the fund by virtue of the priority of their judgment. The subsequent judgment creditors deny the validity of the Ely, Clapp & Bowen judgment, and insist that they are entitled to have it set aside, as to them, on the ground of illegally and fraud.

The judgment complained of was entered by confession against Benjamin Parkhurst, on the second of November, 1853, under and by virtue of the provisions of an act directing the mode of entering judgments on bonds with warrants of attorney to confess judgments. *Nix. Dig.* 68.

The 5th section of the act provides that no judgment shall be entered, unless the plaintiff, or his attorney, shall produce, at the time of confessing such judgment, an affidavit of the true consideration of the bill, bond, deed, note, or other instrument of writing or demand for which the said judgment shall be confessed, which affidavit shall further set forth that the debt or demand for which the judgment is confessed is justly and honestly due and ow-

ing to the person or persons to whom the judgment is confessed, and the said judgment is not confessed to answer any fraudulent intent or purpose, &c.

The affidavit made in this case was, that judgment was about to be confessed " upon a certain promissory note, made and delivered by said Benjamin Parkhurst to said firm of Ely, Clapp & Bowen, and bearing date the 2d November, 1853, and payable on demand to said firm, or order, for the sum of $10,000, for value received, without defalcation or discount ;" and further, " that the true consideration of said promissory note, on or for which said judgment is about to be confessed as aforesaid, is goods, wares and merchandise, by said firm sold and delivered to said Benjamin Parkhurst, at his request, and money lent and advanced by said firm to said Benjamin Parkhurst, at said Parkhurst's request;" and further, " that the debt for which said judgment is confessed is justly and honesty due and owing to this deponent and his said co-partners, as such firm as aforesaid, from said Benjamin Parkhurst, and that the said judgment is not confessed to answer any fraudulent intent or purpose," &c..

The note for $10,000, mentioned in the affidavit, and for which the judgment was confessed, was given at the time of the confession, and for the purpose of the judgment. The actual indebtedness of Parkhurst to the firm of Ely, Clapp & Bowen, at the time, was but $3052.94, including a note of $1000, the *bona fides* of which has been questioned. The remaining $6947.06 was the note of the firm, given to Parkhurst at the time, with the understanding that they should subsequently advance to Parkhurst goods and cash to that amount, as he should require.

The controversy in this case does not grow out of any ambiguity in the statute. Its language is very plain. In the 1st and 2d sections, it prescribes the mode of entering up judgments on bonds or other obligations for the payment of money only, with warrants of attorney. In the 4th section, it enacts that judgments in such cases shall

not be entered in any other mode. And the 5th section, as we have seen, provides that *no* judgment shall be entered in any court of record in this state on a warrant of attorney to confess such judgment, or by the defendant appearing in person in open court, and confessing the same, *unless* certain pre-requisites are complied with. If the judgment is to be entered on a note, the plaintiff, his attorney, or agent, must swear——1st, to the *true* consideration of the note ; and 2d, that the debt is justly and honestly *due* and *owing.*

Now it is true the plaintiffs made the affidavit required by the statute. But it is quite clear, indeed it is conceded, that, as to nearly $7000 of the sum, the note on which the judgment was confessed was not given for goods sold or money advanced ; the affidavit was therefore untrue in point of fact. Nor was the debt for which judgment was confessed justly due and owing by the defendant to the plaintiffs, in the sense contemplated by the statute. For, as to the $6947.06, it was a mere exchange of notes between Ely, Clapp and Bowen and Parkhurst; and the note which Parkhurst received, he swears was given to him by Mr. Clapp, with the understanding that it should be given up immediately after the judgment was confessed, and was to be considered void and without vitality. It was to be used merely as a matter of form to answer the law, so that he could make affidavit to the amount of the indebtedness. The note was delivered to him, and he kept it in his possession about half an hour, and returned it to Mr. Runyon, and never heard of it since. And although Mr. Runyon, who was the attorney for the plaintiffs in entering up the judgment, gives a somewhat different version of the transaction, says he did not get the note from Parkhurst until the next day, and then only as a matter of precaution, at Clapp's suggestion, to prevent Parkhurst from using it before the judgment could be entered and the lien perfected ; that Parkhurst could have had it any time afterwards ; that he kept it but some

eight days, and then delivered it to Mr. Bowen, upon Parkhurst's written order; yet I think it quite clear, from the whole evidence, that the understanding between the parties was, that the note was only to be held by Parkhurst as a security for future advances to that amount from the plaintiffs, according to the terms of the agreement between them.

If A make his promissory note to B for $10,000, and B, at the same time, make his promissory note to A for $10,000, the transaction being a mere exchange of notes, while these notes are held by the respective parties, they stand to each other in the relation of mutual debtors. The demand of each is liable to be set off and liquidated by the demand of the other, and the debt due from each to the other is nominal, and not real. To give the statute a construction which will cover such a case as this—to hold that a mere nominal and illusory indebtedness constitutes a debt or demand justly and honestly due and owing, for which a judgment may be entered up which will put all real and *bona fide* subsequent judgment creditors at defiance, would effectually defeat the purpose of the legislature in introducing the affidavit, and make the statute itself the ready instrument of fraud.

If the judgment cannot be maintained upon the facts of the case, as they stood at the time it was entered, it cannot certainly derive any aid from the misrepresentations of the affidavit. If it cannot stand by the truth, it ought not to be supported by what is untrue. Then it comes to this. Suppose the affidavit had set out that the true consideration of the note on which judgment was confessed was, as to $3052.94, goods sold and delivered, and money loaned by the plaintiffs to Parkhurst, at his request, and as to $6947.06, an agreement to advance to said Parkhurst that amount in goods or money, when he should thereafter request the same, for the performance of which agreement they had given Parkhurst their promissory note for the same amount, to be held by him as security,

and that the said sum of $3052.94 is now justly and honestly due and owing, &c., and the further sum of $6947.06 will become justly and honestly due and owing as soon as the agreement shall be performed, would that affidavit have warranted any judge in signing the *fiat* for judgment? Undoubtedly it would not. Such an affidavit would not only not have complied with the requirements of the statute, but it would have shown upon its face that the plaintiffs were not entitled to a judgment for more than the $3052.94.

But it is insisted that this judgment cannot be assailed by third parties; that the matters objected to it are mere irregularities, of which subsequent judgment creditors cannot take advantage; that the power of entering up these judgments existed at common law, is long anterior to the statute, and only regulated by it; that they are not void for want of conformity to the statute, but only voidable, and that by a direct proceeding by writ of error, which none but a party to the judgment can have. *Scudder* v. *Coryell*, 5 *Halst.* 340, *per* FORD, J.; *Evans* v. *Adams*, 3 *Green* 373; *Hoyt* v. *Hoyt*, 1 *Harr.* 138. In all these cases, however, it is distinctly admitted that if there be any *fraud* in the entry of the judgment, it may be assailed by creditors for that. Mr. Justice Ford, in Scudder *v.* Coryell, says: "Though courts never allow judgments to be impeached for irregularity or want of form by third persons, yet they allow them to be assailed for fraud or *covin* on the application of creditors." Chief Justice Hornblower, in Evans *v.* Adams, says: "If the proceedings are regular, and the affidavit full and complete; yet, if the judgment is fraudulent, it is void as against purchasers and judgment creditors." And the same judge, in Hoyt *v.* Hoyt, says: "They are common law judgments, and good and effectual as such, unless entered up contrary to the statute." "The plaintiff in this case (says the Chief Justice) has submitted himself to the ordeal appointed by the statute. He has made the affidavit required, and his

judgment was regularly signed. Nevertheless it may be assailed for fraud; it may be shown that the plaintiff has sworn corruptly that the defendant was neither legally nor equitably indebted to him one cent; that it was a corrupt transaction."

Then, admitting the doctrine of the cases cited, the question of fraud remains. If this judgment is fraudulent, it may be set aside upon the application of subsequent judgment creditors, according to all the cases. Now here is a judgment entered up on an affidavit which complies with the form of the statute; upon the face of the papers all is regular; and yet the facts of the case show that the plaintiffs were not entitled to any such judgment; no such transaction had occurred as the sale of goods and the loan of money to the amount of $10,000 to the defendant; no such indebtedness existed at the time; if the affidavit had represented the facts truly, the judgment would not have been signed. But the affidavit is framed, not according to the facts, but so as to meet the exigencies of the statute; a fictitious case is made out, the judge is misled by it, and the judgment obtained.

If the transaction had been such as Mr. Runyon, the attorney of the plaintiffs, understood it to be at the time, the case might have presented a different aspect. Mr. Runyon, as is evident from his testimony, was led to believe that, as to the $6947, the money was to be paid at once; that the only reason it was not, was that the plaintiffs kept their bank account in New York, and it being past bank hours the money could not be had that day; and that the note was given payable on demand, as cash, and to be promptly paid; that a real indebtedness was to be created simultaneously with the entering of the judgment; and he told the parties if this was so, if this arrangement was made *bona fide* it would be right. But the answer of the plaintiffs to the bill in chancery shows that such was not the real understanding upon which the note was given. The plaintiffs there say that "the said

Clapp v. Ely.

Parkhurst, having originally proposed to said Dewitt Clinton Clapp that, seeing that he, the said Parkhurst, would only want said residue in such sums of money or amount of goods as from time to time he should need in his business, the said Clapp should give him the note of the firm, payable on demand, for the same so agreed to be advanced; the said Clapp then acceded to said proposition, and accordingly gave to said Parkhurst said note for the amount of said residue," &c. The note, coupled with the agreement, was a mere security for future advances of money or goods, as the exigencies of Parkhurst's business might require. The arrangement was, that Parkhurst was to have a credit margin with the plaintiffs to the amount of $6947. It was so treated by the parties after the judgment was entered. The note was never presented; the money never demanded upon it; but on the contrary, it was given up the next day to the plaintiffs' attorney, and some days afterwards surrendered to them by Parkhurst's order, before the credit margin had been exhausted. The note was never treated as a liability to be realized upon at once, or as the mere temporary substitute for value, to be immediately paid in full on demand.

No case has ever gone so far as to hold a judgment by confession entered up under the statute, *upon an agreement for future advances,* to be unassailable by subsequent judgment creditors. The want of consideration was held, in *Reed* v. *Bainbridge,* 1 *South.* 351, to be available to set aside the judgment on the application of a third party. That was anterior to the act of 1817, which required an affidavit. The cases immediately subsequent to that act treat judgments not entered in conformity with the acts of 1798 and 1817 as constructively fraudulent. *Parker* v. *Griggs,* 1 *South.* 161; *Cliver* v. *Applegate,* 2 *South.* 480. And so did the earlier cases under the act of 1820. *Woodward* · v. *Cook,* 1 *Halst.* 160; and *Sheppard* v. *Sheppard,* 5 *Halst.* 250. Up to this time the court seems to

have entertained the opinion that the acts of 1817 and 1820 operated to take away the common law power of the judges of entering judgment by confession, and substitute for it the statutory power, with its limitations. These statutes declared expressly that *no judgment should be entered up* in any court of record of this state on a warrant of attorney for confessing such judgment, *unless* certain pre-requisites were complied with. But Mr. Justice Ford, in *Scudder* v. *Coryell,* 5 *Halst.* 340, broached the doctrine that these statutes were intended for the *regulation* of an existing power at the common law, and not for the introduction of a *new* one; and therefore, as the judges had jurisdiction of these cases independent of the statute, any lack of conformity to the provisions of the statute was but an irregularity of which a third party could not take advantage, because he could not have a writ of error. The subsequent cases of *Evans* v. *Adams,* 3 *Green* 373, and *Hoyt* v. *Hoyt* 1 *Harr.* 138, adopted this doctrine.

But none of the cases have held that it was a mere irregularity to enter a judgment by confession without a substantial existing *bona fide* debt due as the consideration for it. And all of them concur in admitting that fraud will always avoid a judgment on the application of subsequent judgment creditors. In Scudder *v.* Coryell, there was no dispute as to the debt; the objection principally relied on was that judgment was entered up one day before it became due; and the court held that the word *due* signified, at times, a simple indebtedness, without reference to the time of payment, *debitum in presenti, solvendum in futuro,* at other times that the day of payment or render had passed; that the purpose of the legislature, in the clause referred to, was not to delay the entry of judgments until after the day of payment, but to secure fairness, honesty, and good faith in the transaction. In *Latham* v. *Lawrence,* 6 *Halst.* 322, the court held that an affidavit that the true consideration of the bond was certain notes of hand, &c, without stating what the con-

sideration of the notes was, was insufficient and illusory. The judgment was set aside in the court below on the application of subsequent judgment creditors, and the case was brought up by writ of error, the question whether the matter could be assigned for error being waived. But there was no attempt, in that case, to show fraud. It did not appear that the notes were not given for a debt actually due, but only that the consideration was not set out. In Evans v. Adams, no fraud was alleged in the entry of the judgment—no question made but that the debt was honestly due and owing. The court below set it aside, on the application of judgment creditors, on the ground that the affidavit was defective and illegal. The Supreme Court decided that the affidavit was sufficient; and that, even if it had been defective, third parties could not take advantage of that. Hoyt v. Hoyt, it was insisted by the plaintiff's counsel, was a case in point. But there the plaintiff had given his own note to the defendant, to be immediately used by the defendant in the payment of his, the defendant's, debt. The defendant had actually endorsed it over to his creditor in payment of the debt. There was no pretence of fraud. The plaintiff, being the maker of the note, was bound to pay it unconditionally. It had become his own debt, payable to a third party. This is the distinction between the case of Hoyt v. Hoyt and that before the court. Here, in the case we are considering, the note was not only never parted with by Parkhurst until the plaintiff got it back into his own possession, but it is perfectly clear that the agreement upon which the note was given was, that it was not to be considered or treated by Parkhurst as negotiable paper; that it was not to be endorsed away to third parties, but that it was to be paid by the plaintiffs to Parkhurst himself, in such sums of money or amount of goods as from time to time he should need in his business. It was to be paid by future advances, to be made to Parkhurst by the plaintiffs. This was the agreement, as Mr. Clapp,

one of the plaintiffs, who made the arrangement and transacted the business, states it himself, in his answer under oath ; and it is therefore to be taken as an admitted fact in the case. The note, says the answer, " was given said Parkhurst as a security to him for the making of said advances and the giving of said credit for goods as aforesaid, and was so understood between Dewitt C. Clapp and said Benjamin Parkhurst ; and it was, at the giving of said note, expressly agreed, between said Clapp and said Parkhurst, that the advances which should be made, and the credit for goods which should be given, should, as the same were made and given, respectively, be endorsed on said note, as a credit thereon." Then it is clear that this note, coupled with this agreement, was all that Parkhurst got for $6947 of the note of $10,000 he gave the plaintiffs, on which they entered up the judgment. Parkhurst owed the plaintiffs $3053 ; the plaintiffs agreed to advance him, at some future time, $6947 more, and gave their note to him as security for such advances ; took from him a note of $10,000, and entered up the judgment for that amount. Clearly, therefore, as the facts stood at the time of entering the judgment, as far as $6947 went, it stood as a case of mutual indebtedness between the parties, created by an exchange of notes. It is no better than the case put in *Blackwell* v. *Rankin*, 3 *Halst. Ch. R.* 159, where the Chancellor very properly said : " It cannot be that A may borrow B's note, and keep it himself, and confess a judgment to B for the amount of it. If that could be done, the statute might as well be repealed."

The object of the statute was to provide additional safeguards for creditors against fraudulent confessions of judgments. It was intended for the protection of honest *bona fide* creditors. It left to the debtor the power of making preferences among his actual creditors without limitation or restraint. It left to an embarrassed debtor the power of saying to an importunate creditor, if you sue

Clapp v. Ely.

me, you will get nothing; and he could often use the' threat with effect. But it never was designed to afford a debtor the means of using a fictitious indebtedness to defeat the honest claims of his actual creditors. The review of all the cases shows, as we have seen, that the extent to which the Supreme Court has heretofore gone has been to hold that where the debt is *bona fide*, absolute, unconditional, and existing at the time of the judgment, the judgment will not be set aside at the instance of subsequent judgment creditors for mere irregularity or defect' in the form of the proceedings; but where the objection is to the substance, and not the mere form; where the *bona fides* of the judgment is assailed; where it appears that, at the time of the judgment, there is in point of fact no existing indebtedness, the Supreme Court has never held that subsequent judgment creditors have no redress.

To maintain this judgment, the court must go the length now, for the first time, of saying that an agreement for future advances is a good consideration for a judgment by confession, and that subsequent judgment creditors cannot successfully assail it, provided the advances are made before other judgments are obtained. If that is established as law, the court will have to hold that it is sufficient if the affidavit state that the true consideration of the judgment about to be confessed is an agreement between the parties, that the plaintiff will hereafter make advances to the defendant to the amount of the judgment; for it will not surely be held that the validity of the judgment is to depend upon the question whether the plaintiff has the hardihood to swear to an actual present indebtedness, where none exists. If we hold such an affidavit sufficient, we must do so in the very face of the statute, which requires a present indebtedness to be sworn to; and it will certainly be taking a step in advance of what has heretofore been considered the

policy of the law, and add to the absolute power of preferring a present debt, that of securing a future credit.

Looking through the forms in which this transaction has been wrapped up, there is nothing in it but an agreement between these parties, at the time of the judgment, that, as to the $6947, the one should make future advances to the other. The note given to Parkhurst was not to be used by him ; he could not have used it without violating the agreement upon which it was given. Then, as to the $6947, it was not an existing indebtedness, within the meaning of the statute, for which a judgment could be legally entered. So far as that sum is concerned, the judgment was entered upon a misrepresentation of facts in the affidavit, and was a fraud upon the law.

Another question has been made as to the *bona fides* of this judgment. It is urged that the plaintiffs had obtained a note from Parkhurst for $1000, which formed a part of the sum of $3052.94, by fraud. It appears that, in February, 1853, Parkhurst, being insolvent, called his creditors together, and proposed to compromise with them, by giving his notes for fifty per cent. of their claims, payable on time. That Ely, Clapp and Bowen agreed, with the other creditors, to the compromise, but being creditors to the amount of $4029.46, they privately exacted of Parkhurst a note for $1000, in addition to their fifty per cent., as the terms upon which, alone, they would enter into the compromise ; and that this note constitutes $1000 of the $3052.94, part of the judgment confessed. But we cannot go into this question here. Independent of the compromise, there was a good consideration for this note, a real existing indebtedness for which it was given. If it was exacted in bad faith, it was in bad faith to the other parties to the compromise. They are not, as such parties, before the court. The omission to state the consideration of the note of $1000 was an irregularity. But it appearing that there was a consideration for the note, which was good as between the parties to it, the present applying judgment creditors cannot object to it.

The only remaining question is, whether the judgment in favor of the plaintiffs for $10,000 should be set aside *in toto*, or only as to the $6947.06. This was an application to the equitable power of the Supreme Court to determine the rights of conflicting judgment creditors to the funds in the hands of the sheriff. The motion was to set aside the plaintiff's judgment for fraud. If there was actual fraud, involving moral turpitude on the part of the plaintiffs, the whole judgment should be avoided and set aside; if the judgment was only constructively fraudulent, the court will do justice between the parties, by setting it aside only so far as it exceeds the amount the plaintiffs were actually entitled to at the time it was confessed. It is not a case for a reference to a jury. The facts are ascertained. They are before the court. The facts of a transaction being ascertained, whether that transaction was fraudulent or not, is a question of law; fraud being the judgment of the law on facts and intents. *Pettibone* v. *Stevens*, 15 *Conn.* 19.

The court will not infer that actual fraud involving moral turpitude was intended, if by any fair interpretation of the conduct of the party charged with it, a different conclusion can be reached. In this case there is no doubt the plaintiffs intended to make the advances according to their agreement with Parkhurst, and to hold the judgment for nothing more than might be actually due them when it came to be enforced. They may have sworn to the affidavit under a misconception of the law, and without any intention to practice a deception or obtain a judgment improperly; and although there is some testimony which would warrant a different conclusion as to the character of the transaction, it may be conceded that the Supreme Court was right in holding that no actual fraud was intended to be perpetrated. Taking this view of the case, as the judgment is divisible, and the amount actually due and owing to the plaintiffs at the time the judgment was confessed is ascertained, the order

of the Supreme Court dismissing the rule to show cause should be set aside, and the plaintiffs' judgment be declared valid and entitled to its priority for the sum of $3052.94, with interest on that amount from its date; and as to the remaining sum, invalid as against the subsequent judgment creditors. This course was taken in the somewhat similar case of *Ayres* v. *Husted*, 15 *Conn.* 504, and will do justice between the parties.

OGDEN, J., (dissenting.) This proceeding involves the rights of contending judgment creditors to moneys which were raised upon executions issued against the property of their common debtor, and paid into the Supreme Court.

In the latter part of the year 1853 the sheriff of the county of Essex sold the stock of dry goods of one Benjamin Parkhurst, a merchant in the city of Newark, by virtue of sundry executions against the said Parkhurst, some issued out of the Supreme Court, and others out of the Circuit Court of that county.

The net avails of the sales, amounting to the sum of $7951.10, were directed, by the Supreme Court, to be paid to their clerk, to await a decision upon an application made to them to have those moneys distributed *pro ratâ* among certain specified judgment creditors, to the exclusion of these defendants, who hold the first judgment.

In June Term, 1855, after hearing the matter debated, the court ordered and directed that the moneys thus raised should be paid over to these defendants, which order, with the proceedings connected therewith, has been removed by writ of error into this court.

All the judgments were entered by confession upon warrants of attorney without bonds; and as to the form of the affidavit prescribed by the statute, all are full and correct.

The judgment in favor of Ely, Clapp, and Bowen, who are the defendants in this court, was signed, on the 2d day

of November, 1853, for $10,000 damages with costs, and was entered in the minutes of the Supreme Court on the fourth, and an execution was immediately issued thereon, and duly levied on the stock of goods in Parkhurst's store. The judgment in favor of Clapp, Kent and Buckley was signed on the 14th of November, in the Supreme Court, for $3122 damages, with costs, and the execution issued thereon was levied upon the same property on the 15th of November, eleven days after the levy was made under the execution in favor of these defendants.

The judgment in favor of Lord and Brown was confessed in the same court, on the 16th of November, and the execution was levied on the 17th, upon the same property. Two judgments were confessed in the Circuit Court of the county of Essex, one in favor of Oliver E. Hosmer, for $2769.95, besides costs, and an execution issued thereon, was levied upon the same property, on the 17th of November, and the other, in favor of Norman Cutter, whose execution was levied on the 19th of November. These junior executions, if entitled to priority in payment, will absorb all the moneys which are under the control of the Supreme Court. The dates of the respective judgments and levies have been thus particularly set out, because a reference to time will be material, in my view, for properly settling the rights of the parties.

Two reasons are assigned, by the plaintiffs in error, why the prior judgment of the defendants in error should be postponed to theirs.

*First.* They say that the affidavit which was produced to the justice of the Supreme Court when he signed the *fiat*, and which was filed with the papers in the case, did not set forth the true consideration of the note on which the judgment was confessed; and hence, that the judgment is voidable, whether the departure from the statute, which prescribes the form and character of the affidavit, arose from mistake or from intention.

*Second.* They say that there was *actual fraud* in the transaction on the part of Ely, Clapp and Bowen.

A preliminary question has been discussed, involving the right of judgment creditors to make an application of this character.

It is now well settled, by repeated adjudications in this state, that subsequent judgment creditors cannot, on motion, impeach a prior judgment for mere *irregularity.* Such irregularity does not necessarily make the judgment void, nor can it create an equity in favor of other creditors; because, though irregular in form, the judgment may be honest in fact, and if the defendant sees proper to overlook the irregularity, the judgment is binding as to all others. Courts, however, will exercise a control over their judgments, and when successfully impeached for fraud or *covin* they may be postponed in favor of subsequent *bona fide* judgment creditors.

It should be borne in mind that applications for such relief are addressed to the equitable powers of courts, and are founded on facts showing that justice requires their interference. *Evans* v. *Adams*, 3 *Green* 373 ; *Hoyt* v. *Hoyt*, 1 *Harr.* 138, and the cases therein cited ; *Den, ex dem. of Vanderveer,* v. *Gaston*, 1 *Dutcher* 615.

A suspicion of injustice, or doubts of a substantial compliance with the requirements of the law, should not destroy the security of a judgment. "Its invalidity should clearly be established." *Caldwell* v. *Fifield and Matthews*, 4 *Zab.* 154.

Hence it follows, that unless the case before us shows either *actual fraud* or *legal fraud, by which the applying creditors were injured in their rights,* the decision of the Supreme Court was correct.

The affidavit made by D. C. Clapp, one of the firm of Ely, Clapp and Bowen, sets out that the judgment was confessed upon a promissory note, made and delivered by Parkhurst to their firm, bearing date the 2d of November, 1853, payable on demand, to them or order, for the sum of $10,000, for value received ; and that the true consideration of the note was goods, wares, and merchandise sold

and delivered by their firm to Parkhurst, at his request, and money lent and advanced by them to him, at his request; and further, that the debt for which the judgment was confessed was *justly and honestly due and owing* to him and his partners from Parkhurst; and that the judgment was not confessed to answer any fraudulent intent or purpose, or to protect the property of Parkhurst from his other creditors. In form and substance, it is a full and complete compliance with the language of the 5th section of the statute. *Nix. Dig.* 69.

The justice of the Supreme Court, to whom the papers were presented for his *fiat*, could not look behind the affidavit, nor inquire into its truth; the party was entitled to his signature, and when it was affixed it created a judgment at common law. The object of the section requiring an affidavit was answered; its force was spent when the conscience of the creditor was tested, and the inhibition against entering the judgment was fully taken off.

If, then, the testimony before us does not show a state of facts contradictory of the affidavit, and either necessarily tainting the transaction with *legal fraud* prejudicial to the rights of the subsequent judgment creditors, or with *actual intentional* fraud, the plaintiffs in error should not prevail before this court.

Properly to determine the just bearing of the depositions upon the truth of the affidavit, it is necessary to collate the material facts, which it is insisted that they disclose. It is evident, from the testimony, that on the day the judgment for $10,000 was confessed to the defendants in error, Parkhurst was certainly indebted to them in the sum of $3052.94, for goods theretofore sold and for money lent; and that such amount was then justly and honestly due and owing to them upon the most strict construction of the statute. This sum included a note of $1000, given to them by Parkhurst, when he made a composition with other creditors, in or about February, 1853,

which note is now assailed, as having been required by and given to them in fraud of those creditors, as the condition upon which Ely, Clapp and Bowen would sign the composition.

This objection is sufficiently answered by the fact that when the $1000 note was given, Parkhurst owed Ely, Clapp and Bowen more than the amount of it, in addition to the sum which they agreed to take in common with other creditors. He had a legal right subsequently to secure the payment of that note, without thereby committing a fraud upon his creditors; and the creditors now before this court, cannot justly object to his having so done, or contend that the note did not form a *bona fide* debt, which could legally be included in a confessed judgment.

It is also established by the proofs, that, in October, 1853, Parkhurst was pressed for money to carry on his mercantile business, and that Ely, Clapp and Bowen, who then were his creditors to a large amount, agreed, at his request, to advance to him for that purpose, in goods and in cash, $6947.06, if he would confess a judgment to them for $10,000, which amount of $10,000 would also cover the then existing indebtedness; that such arrangement was entered into between them, and in fulfillment thereof, that Parkhurst gave his note for $10,000, upon which the judgment in question was confessed; and that, at the same time, they gave *their* note, payable to him or his order on demand, for $6947.06, the amount then agreed to be advanced by them; and they delivered the same to him, which note was to be available to Parkhurst in goods and money, as he might thereafter order or appoint, to meet the then emergencies of his business; that the payment of the difference in cash, by giving a check upon their bank of deposit in New York, was talked of by Mr. Clapp, and that the mutual counsel of the parties advised them that a note payable on demand would be legal and right, if the transaction between them was *bona fide*; that

after the papers were prepared for effecting the confession of the judgment, Mr. Runyon the attorney and counsel of the parties, for the purpose of preventing a transfer or appropriation of the note of Ely, Clapp and Bowen by Parkhurst before the security through the judgment could be completed, prudentially asked and obtained from him the custody of the note, to be retained only until the judgment and the lien contemplated by it should be perfected, holding said note, as understood by both parties, subject to the control and order of Parkhurst; that Parkhurst began on the following day, and from thence continued so avail himself of the benefit of the fund which the note secured to him for the purposes theretofore agreed upon between him and these defendants, by drawing, on that day, in cash $700, and by taking, on the day thereafter, a bill of goods to the amount of $100; and within a week after the entry of the judgment, and before any other lien was created or contemplated, by applying for and receiving from them a check for $4965.73, which amount was drawn by him in money, and applied to the payment of his pre-existing indebtedness; and that Mr. Bowen, on the 11th November, presented to Mr. Runyon a written order from Parkhurst, dated the 10th, requesting him to give up the note to Ely, Clapp and Bowen, as he, Parkhurst, had received the value for it. And it likewise appears that, when the note was given up to Ely, Clapp and Bowen as satisfied, which was three days before Parkhurst confessed any other judgment, or the plaintiffs in error had any right to question the judgment of the defendants in error, even for palpable positive fraud, because they then had no interest in the property affected by it, the defendants had advanced to him, in goods and in cash, upon their said agreement, represented by the note for $6947, the sum of $6189.48, for the security of which advances, if these defendants had not previously taken a judgment covering the amount of that note, on which they were advised by counsel that

they could rely for security, they at that time could have asked and obtained of Parkhurst a second warrant of attorney for the confession of a judgment, and upon the production of an affidavit to a judge, drawn in the precise language of the one before this court, could have obtained his *fiat*, which judgment would not have been assailable upon the ground now set up by the plaintiffs in error, and they could have procured a levy to have been made before any other lien had fastened upon the stock of goods.

It appears, from the evidence, that the money for the check of $4965.73, given by the defendants to Parkhurst, went to pay his indebtedness to Carter, Quinan and Deforest, of the city of New York, who, in August, 1853, had obtained a judgment by confession against him in the Supreme Court of this state, as security for the payment of that indebtedness; which judgment then remained in full force, and was a lien upon the property sold by the sheriff, prior to any of the judgments held by the parties who are before this court. And if it had not been satisfied with the moneys so advanced by these defendants, it would have been entitled to priority in payment out of the moneys now in controversy.

The advance of that sum by the defendants expressly for that purpose, upon no consideration other than the supposed validity of their judgment for $10,000, created a strong claim in them to have an equitable interest in that judgment, by an implied assignment of it, and to be subrogated to the rights of Carter, Quinan & Co. in that security. These facts, which I have gathered from the mass of testimony taken under a rule of the Supreme Court, in my opinion, fully support two important conclusions.

*First.* That no actual fraud, calling for an exercise of the equitable powers of the court, appears to have been meditated or committed against the plaintiffs in error, or any of them, in the negotiations or transactions between Parkhurst and Ely, Clapp and Bowen in the inception of the judgment of $10,000.

*Second.* That on the day Parkhurst confessed the judgments to the several plaintiffs in error, Ely, Clapp and Bowen had as strong equities upon which to claim the appropriation of the moneys subsequently raised by the sheriff, as the junior judgment creditors possibly could have. And hence it follows, that having such equitable rights, coupled with a legal advantage over the others, acquired through their prior judgment and levy, they ought not, upon safe and sound principles of law and equity, to be divested by this court of their legal *preference* over the plaintiffs in error, as established by the judgment of the Supreme Court, unless that preference has been absolutely forfeited by a fraud in law invalidating their security.

If the testimony upon which the argument before the court was founded had disclosed any facts tending to raise a fair presumption or well-grounded suspicion that the judgment of Ely, Clapp and Bowen was not based upon an actual honest indebtedness, but on the contrary, that it had been contrived to create a fictitious lien for the purpose of covering and protecting the property of the debtor, to the detriment of his honest creditors, the court would not here settle the fact of fraud or no fraud, but it would direct a feigned issue, whereby the important question could be settled by a jury. But while, in a liberal exercise of its equitable jurisdiction over confessed judgments, the court, on proper occasions, will lend its aid for the detection of alleged frauds, and will look behind the affidavit, it ought not, in a case like the present, to withhold from the defendants in error their remedy through their judgment, and subject them to the expenses incident to an investigation before a jury, when, upon the case made by the applicants, no fact has been established on which the suspicion of *mala fides* or of positive intentional fraud can justly rest.

The larger portion of the consideration for the note of $1000 being neither money actually lent nor goods sold

and delivered at or before the date thereof, but it being a simultaneous engagement of these defendants to furnish the one or the other, when required by Parkhurst, recognized and declared by the delivery and receipt of their negotiable note for the amount of the advances thus agreed upon, payable on demand, the questions must be met and disposed of, whether the affidavit is a substantial compliance with the requirement of the statute; and if it is not, whether the variance is such a fraud in law as should make the judgment voidable in favor of subsequent judgment creditors, whose rights, *as such*, were not acquired until after the whole amount agreed upon between Ely, Clapp and Bowen and Parkhurst had been advanced.

It is manifest that the draftsmen of the affidavit supposed that the note for $6947.06, which was given by Ely, Clapp and Bowen to Parkhurst, in fulfillment of their agreement to aid him, was in legal contemplation equivalent to a loan and advance of so much money; because if he had not thus have viewed the transaction, he might have stated the true consideration of that portion of the $10,000 note as the fact really was, namely, a negotiable note of the plaintiffs, payable on demand, transferable by the defendant, at his option.

Such, I think, would have been the more correct mode of setting out the consideration, because it would have shown the case as it existed. To meet the requirements of the act, a statement of the manner in which the debtor owes the debt is obviously called for, that is, the cause of the indebtedness, or "the price of the debt," a statement of the manner in which it occurred, according to the facts made in terms sufficiently precise to disclose the real nature of the transaction.

A minute detail of sums and of dates, as in a bill of particulars under the practice act, is not required; but the true consideration should be intelligibly stated in general terms. *Scudder* v. *Coryell*, 5 *Halst.* 340; *Latham* v. *Lawrence*, 6 *Halst.* 322.

What, then, should be the legal effect upon the security of a failure minutely to set out in the affidavit all of the true consideration of a note or other indebtedness upon which a judgment is confessed? If it plainly appears that another creditor has been thereby misled, and innocently prejudiced in his rights, such facts should induce the court to postpone the judgment in favor of that junior judgment creditor. No such insistment, however, has been made in behalf of any of the creditors before this court. The irregularity cannot *per se* affect the validity or priority of the judgment while it stands unreversed.

It has been decided, in *Den, ex dem. Vandervere,* v. *Gaston & Mason,* 4 *Zab.* 818, and recognized in another suit between the same parties, in March Term, 1856, reported in 1 *Dutcher* 615, that a judgment by confession *without an affidavit* is not absolutely void and fraudulent.

The power of allowing judgments to be signed at chambers, in this state, is not conferred upon the judge of a court of common law jurisdiction by the provisions of the statute under consideration. Such power is an incident to the nature and constitution of the court, and the statute can only regulate the exercise of an existing inherent jurisdiction. Judgments thus entered are not null and void simply for lack of compliance with the provisions of the act, but they can only be attacked for such mere irregularity by a party to the record, because they injure none others, and none other can have a writ of error. In this aspect of the case, the judgment in favor of Ely, Clapp and Bowen must be recognized as a valid subsisting judgment.

The constitution of courts for the trial of small causes is entirely different. They are statutory tribunals of limited jurisdiction, having no powers excepting those conferred by the act constructing them, and no course of proceedings, excepting as it is marked out in that act and its supplements. The first statute, entitled "An act constituting courts for the trial of small causes," was passed

in 1798, and the 19th section of it permitted parties to enter without process any action before a justice of the peace, to the decision of which he was competent, if process had been issued; and it authorized the justice to proceed thereon to judgment and execution in the same manner' as if a warrant or summons had been served. Without that section, no such proceeding in that court would have been valid, because the issuing and return of a process, duly served according to the provisions of the statute, were necessary to give the court power to proceed to trial or judgment. In the second section of the act to prevent the fraudulent confession of judgments, passed on the 29th of January, 1817, it is declared that no *judgment* shall be *entered* by confession where parties thus go before a justice of the peace without process, unless an affidavit, made in compliance with the 1st section of that act, be made and filed with the justice. Hence an omission to fulfill the requirements of both acts, in a proceeding in that court, raised a question of original jurisdiction, and the Supreme Court were required, in cases on *certiorari* where such omissions were established, to declare the judgments void, because the court had no jurisdiction nor power to proceed to judgment. But in the superior courts, which derive their powers from the common law, the rules for applying regulating statutes are different. Jurisdiction over the parties and the subject matter is inherent in those courts without the aid of a statute, and they proceed to judgment according to the course of the common law. Hence the early decisions of the Supreme Court declaring judgments void rendered in courts for the trial of small causes, which were not supported by proper affidavits, do not apply, in the full force of their language, to judgments entered in the Supreme Court or other courts of general jurisdiction. In common law tribunals of general jurisdiction, a judge at chambers, before the passage of the act of 1817, upon the production of a warrant of attorney, could make his written *fiat* for a judg-

Clapp v. Ely.

ment which became as operative as a judgment obtained upon process and regular proceedings. The absolute prohibition of judgments by confession in the courts for the trial of small causes lasted only one year. On the 12th of February, 1818, the act of 1798, and the second section of the act of 1817, "to prevent the fraudulent confession of judgments," were repealed: and it then was enacted that parties might enter an action by consent before a justice of the peace, who shall proceed thereon to final judgment and execution. But it was also provided that if judgment by confession be entered against a defendant, unless an affidavit shall be made as directed in the 1st section of the act of 1817, such judgment shall not operate or have any effect against any person or persons not parties in said action, but shall be binding and have its full effect as far as relates to the parties in the suit only. This section authorized the *entry* of judgments in that court by confession without the production of an affidavit, but it limited their operation. So the law stands at the present time in the courts for the trial of small causes, excepting as the act directing the mode of entering judgments on bonds and warrants of attorney, has changed the matters which are required to be set out in the affidavit.

If this contention of the plaintiffs in error be corrected, to wit, that proof of a material variance between the facts, as set out in an affidavit, and those which really exist, makes a judgment confessed in a common law court, upon the production of such affidavit, void, although no actual fraud exists, then we have this anomaly in our judicial system, that a judgment in a statutory court of limited jurisdiction may be good for some purposes, and a judgment entered up in a common law tribunal of general jurisdiction, under the like circumstances, and tested by the policy of the same law, (whether it be directory or prohibitory,) shall be absolutely void and for nothing holden. I have always thought that, in enacting that a

Clapp v. Ely.

judgment might be lawfully entered upon a voluntary appearance in a justice's court without affidavit, and be binding upon the parties to it, the legislature intended by statute simply to clothe that tribunal with a portion of the power which the courts of record in the state inherently possess, notwithstanding the language of the acts which have directed the production of affidavits, and not to give judgments in that court an efficacy beyond what attaches to those rendered in the common law tribunals.

In *Parker* v. *Griggs*, 1 *South.* 161, which was a case of confession of judgment in a justice's court without the production of the affidavit, the judges said—"the words of the statute are peremptory; the justice had no authority: the judgment is fraudulent." Again—"the affidavit is absolutely necessary to give the justice power to enter a judgment. His proceeding without it is a perfect nullity." So in *Cliver* v. *Applegate,* 2 *South.* 479, the court ruled that a judgment confessed before a justice without the affidavit, was void, and not a valid judgment.

The fact to which the attention of the court was directed in the case of *Sheppard* v. *Sheppard*, 5 *Halst.* 250, was a levy made under an execution issued out of a justice's court, where a judgment was entered on confession by an appearance without process, the affidavit produced being defective upon *its face.* The cases above cited are referred to in this case, and the ruling of the Supreme Court is placed on the same ground as it was in those cases.

The case of *Reading* v. *Reading,* 4 *Zab.* 359, was relied upon by the plaintiffs in error as sustaining their proposition, that judgment creditors can prevail in setting aside a judgment in a common law court for the non-conformity of the affidavit with the provisions of the statute. In that case the court was called upon to reverse an order of the Court of Common Pleas, made upon the application of the *defendant* in the judgment, which order set aside a judgment entered by confession in that court, because the

Clapp v. Ely.

affidavit produced did not show upon its face even a *substantial* compliance with the statute. The judgment had been impeached by a party who could bring a writ of error—the defendant himself; and he could well say to the court that the judgment entered is not the one I intended to confess, because it is not accompanied with the affidavit, which my creditor was bound by law to make. The Supreme Court affirmed the order of the Pleas upon the inspection of the affidavit. It was said by one of the justices, in his opinion, and not gainsaid by any of his associates, "that courts derive their power to render judgments on warrants of attorney from the common law; but the statute of this state has limited the exercise of that power to cases wherein a *prescribed* affidavit is produced to the officer. If a judge or other officer signs a judgment contrary to the provisions of the statute, the court having control over its records, upon *good cause shown,* may vacate and set aside such judgment." Again, it is said, in the same opinion : " As the legislature, in seeking to secure fairness, honesty, and good faith in such transactions, in their wisdom have directed upon what condition alone an honest creditor can exercise his common law right of securing a just debt by a judgment, this court, when called upon to act, must, *ex debito justitiæ,* see that the requirements of the statute are not evaded or misunderstood." The affidavit was declared to be insufficient, and the order of the Common Pleas was affirmed.

In the opinion of another justice, read in the same case, this language is used in commenting upon the case of Evans *v.* Adams: "The judgment in the Pleas was reversed, not upon the application of creditors, but upon that of the defendant himself, and this makes a very different case," to wit, from that of Evans *v.* Adams. " The question here is not whether *creditors* had a right to move for reversal of a judgment below on the ground of a defective affidavit, which was the case of Evans *v.* Adams, but whether, after the defendant himself had got a judg-

ment against him reversed in the court below for ground which was available for *him*, we can, even at his own request, now set aside that reversal on writ of error. The reversal below was right; how can we say it was wrong?" The difficulty in applying the case of Reading *v.* Reading to the one now before this court is this, that the motion was there made by the defendant in the judgment for a defect in the proceedings, patent upon the face of the judgment papers; whereas the present application comes from junior judgment creditors, seeking to invalidate a judgment entered according to law upon the production of an affidavit full and perfect upon its face, and who rely for equitable relief upon matters *in pais,* extrinsic of the papers which were in the cause when the *fiat* was made and the judgment was recorded, and the execution issued and levied.

At this point in the case a question presents itself, whether a common law judgment is such an entirety that in all instances it must be treated as indivisible, and, *ex necessitate,* be held as good or as bad *in whole.* In the case of *Silvers and Brittin,* ads. *Reynolds,* 2 *Harr.* 275, a judgment was entered by confession on warrant of attorney against two persons, and it was held, upon motion and cause shown, that it might be set aside, as to one of them, and stand good, as to the other. Justice Ford said, "If the cause was before us on a writ of error, I do not say that we could reverse the judgment as to one defendant, and affirm it as to the other; but courts of law have, immemorially, exercised an *equitable* power over judgments entered by their authority on warrants of attorney by confession." Justice Dayton had some difficulty in his mind about the entirety of the judgment, and the propriety of relieving one of the defendants; but he finishes his opinion by saying: "As we have exercised a species of *equity power* over judgments entered on bond and warrant of attorney, and substantial justice will be best attained in this way, I concur, upon this point, in the view

taken by Justice Ford." The four judges ordered Brittin's name to be stricken out of the proceedings.

Upon the principle recognized in that case, it certainly would be equitable and just that the judgment of the defendants in error should be held to be valid, and entitled to priority in payment for at least the sum of $3052.94 and the interest, inasmuch as that amount was justly and honestly due to them from Parkhurst, for goods sold and delivered, before Mr. Clapp commenced the negotiation with Parkhurst which resulted in the confession of a judgment for $6947.06, additional to the debt then conceded to be due. If the court could so apply equity to a judgment by confession, as to declare it inoperative as to one of two defendants, and binding upon the other, by the exercise of the same power, it can direct that a judgment shall be divided as to the *amount*, and that such portion of it as is just and upright, and within the language of the statute directing the production of an affidavit, shall be good and available, and that the portion which is successfully impeached shall be postponed in favor of junior judgment creditors.

But the most important question that was involved in the discussion is yet to be examined—can a judgment be confessed in New Jersey to secure future advances?

There is no doubt of the validity of such a judgment between the parties to it. A judgment contrived to defraud creditors is good between the parties. At common law, a judgment to secure such advances (if *bona fide*) would stand as firm as a mortgage. Lord Cowper held, in *Gordon* v. *Graham*, 7 *Viner's Ab.* 52, *letter E, pl.* 3, "that if a clause be inserted in a mortgage, making it a security for future loans, subsequent loans will be taken as parts of the original transaction, and will be paid before a second mortgage intervening, with notice of the clause."

Chief Justice Marshall ruled, in the case of *Shirrass* v. *Craig*, 7 *Cranch* 34, "that a mortgage given to secure future advances was a protection for all advances made prior to the receipt of *actual* notice of a subsequent title."

In 6 *Barb. S. C. R.* 346, *Truscott* v. *King*, Parker, J., says—" Unless *actual* notice is required in such cases, neither a judgment nor a mortgage is of any value as security for future advances," meaning actual notice of an intervening encumbrance.

In the case of *Averill* v. *Loucks*, 6 *Barb. S. C. R.* 19, it is said, by the court, " that a judgment, or other security, may be taken and held for future responsibilities and advances, to the extent of the amount of the judgment or security ; but, to enable a creditor to hold a judgment or other security for future responsibilities or advances, it must be a part of the original agreement that the judgment or security should be a security for such responsibilities or advances."

The same doctrine was held in *Brinkerhoff* v. *Marvin*, 5 *Johns. Ch.* 325 ; *Monell* v. *Smith*, 5 *Cowen* 441 ; *Livingston* v. *McInlay*, 16 *Johns. R.* 165. The court say, in the case last cited, " If it was a part of the original agreement, a judgment may be entered as a security for future advances beyond the amount then actually due, in like manner as a mortgage may so be held."

There is a limitation, however, to the preference which is given to such encumbrances. When a subsequent judgment or mortgage creditor intervenes before the whole advance agreed on is made, and notice thereof is given to the prior encumbrancer, advances made *after* that period will not be covered in preference to the claims of the subsequent creditor.

In *Ter-Hoven* v. *Kern*, 2 *Barr* 96, it is said, "A judgment or mortgage, taken to secure an existing debt, and debts or liabilities to be created in future, has been held to be good and valid by numerous decisions." The judge cites, among other cases, *Gordon* v. *Graham*, 7 *Viner's Ab.* ; *Lyle* v. *Ducomb*, 5 *Binney* 585 ; 4 *Kent's Com.* 175, and he adds, " But if a prior encumbrancer makes future advances on the faith of his judgment with *actual notice* of a new intervening encumbrance, he will be postponed as to such subsequent advances."

It may be taken, as clearly settled at common law, that a judgment *can* be confessed to secure an existing debt, as well as to cover future advances, to the extent of the judgment, beyond the amount actually due, made in fulfillment of an agreement entered into when the judgment is given; and that such judgment will be available for the security of all advances made upon it in good faith, before actual notice is received of an intervening mortgage or judgment encumbrance.

Did our statute alter the common law in regard to the validity of such judgments? The language used does not declare them to *be void.* Does the scope of the enactment show that the legislature intended to *prohibit* the creating of such securities?

The section closes with a requirement that the affidavit shall state " that the judgment is not confessed to answer any fraudulent intent or purpose, or to protect the property of the defendant from his other creditors." This regulation is *literally* complied with when the friend of an honest debtor, who is embarrassed for money to meet his commercial engagements, agrees to advance him means, as he may require them, to a fixed amount, and within a limited time, to save him from failing, and to enable him to pay his creditors, and to protect his business standing in the community, and in good faith and for honest purposes takes a judgment by confession as security for their re-payment.

The object of the act of the legislature unquestionably was to secure fairness, honesty, and good faith; but I think it was not designed for preventing an honest debtor from providing, by means of the security of a judgment by confession, such pecuniary aid as he foresees the exigencies of his business will require.

The question which must test the legality of such a judgment, is not whether, if it had not been entered, some other creditor might have obtained a legal preference, but it is whether the parties to the judgment have

done anything *mala fide* or in violation of the provisions of the statute.

It is manifest, from the testimony taken in this cause, that Parkhurst did not complain of Ely, Clapp and Bowen because there was not a full consideration for the judgment; but his antagonism to them was caused by their insisting upon the sheriff's bringing the stock of goods to sale at an earlier day than Parkhurst had expected, and perhaps in violation of their stipulation to give more time.

After Ely Clapp and Bowen refused to delay the sale under their execution, Parkhurst confessed to the several plaintiffs in error their respective judgments, as it would seem that they might aid him in attempting to defeat a recovery, by Ely, Clapp and Bowen, of the money secured by their judgment and levy, or to delay them in obtaining a sale. Those creditors filed their bill in chancery, not to set aside the judgment of Ely, Clapp and Bowen for irregularity, but to obtain a preference over them upon equitable grounds and for an injunction to stop the sale. As appears from the evidence, those judgments were given and taken for the purpose and intent of delaying and hindering these defendants in the recovery of their just demands.

There was still another objection taken, which is founded upon the remaining clause of the 5th section of the statute. It provides " that the affidavit shall further set forth that the debt or demand for which the judgment is confessed is justly and honestly due and owing to the person to whom the judgment is confessed."

The question has been asked, how an agreement to make a future advance can honestly be sworn to as a debt justly due and owing; and it was argued, that the legislature, in using those words, intended to prevent judgments being confessed by way of security, and to limit them to " debts absolutely due and payable."

A satisfactory answer has been given to this question

by Chief Justice Ewing, in the case of *Scudder* v. *Coryell*, 5 *Halst.* 345. He said the word "due" has more than one signification, or is used, on different occasions, to express distinct ideas. At times it signifies a simple indebtedness, without reference to the time of payment; at others, it shows that the day of payment was passed. In the former sense it appears to have been used in the statute, as it is connected with a word of like signification, "due and owing."

This construction of the act was subsequently adopted by Chief Justice Hornblower and Justice Ryerson in *Hoyt* v. *Hoyt*, 1 *Harr.* 138, and has since been practised upon as the settled law of this state.

In the case last cited, the Chief Justice concludes "that, as the object of the statute was only to secure fairness, honesty, and good faith in the transaction, and not to abridge the common law right of securing a just debt by a judgment, we must not give it that effect by mere implication."

In the same case, Justice Ryerson says that promissory notes of bankers, under some circumstances, have long been treated as cash, not only in commerce, but in courts of justice; and he adds, "that he perceives no reason why the notes of other persons may not be treated in the same way, when such is the agreement and assent of the parties;" and I may add, when the transaction is beneficial to the parties, injurious at the time to no one, and is free from actual fraud.

The facts in the case of *Hoyt* v. *Hoyt*, which were last cited, not fully appearing in the report in 1 *Harrison*, and being misapprehended on this argument, I have referred to the files in the office of the clerk of the Supreme Court, and find them to be as follows: The judgment was entered by confession in favor of Enos *Hoyt* v. *Lorenzo Hoyt*, in the Court of Common Pleas of the county of Essex, on the 15th day of July, 1835, for $1116.35, upon a promissory note, given by the defendant to the

plaintiff, dated July 11th, payable on demand, and made for the purpose of forming a consideration for a judgment by confession for securing an existing liability. The affidavit sets out, among other things, that $701.50, a part of the consideration of the note of the defendant made on the 11th of July, was money lent and advanced by the plaintiff to the defendant, and that the whole demand of $1116.35 was justly and honestly due and owing from L. Hoyt to the plaintiff. After the entry of this judgment, Wilbur and others obtained several judgments against L. Hoyt in courts for the trial of small causes; and upon their application to the Court of Common Pleas of the county of Essex, the judgment in favor of E. Hoyt was postponed in payment to theirs. In the state of the case, signed by the attorneys of the litigant parties, it appears that Enos Hoyt, instead of advancing $701.50 in money to L. Hoyt, as was stated in the affidavit, on the 9th of May, 1835, less than three months before the judgment was confessed to him, had given his note for $600 of the amount of $701.50, drawn in favor of L. Hoyt, or order, payable twelve months from date, which note was endorsed by L. Hoyt to one Aaron Price, in payment of horses and carriages, and that said note was held by Price as an unsatisfied demand against Enos Hoyt when the judgment was confessed, no part of it having then been paid or secured, and Lorenzo remaining liable to be fixed as an endorser, if it should be dishonored at maturity.

It is stated in the case, that after the several judgments were obtained in the justices' courts, E. Hoyt, on the 10th of November, 1835, paid to Price $200 on account of the note, on the 11th, $100, on the 26th, $80, and the balance before the argument upon the rule to show cause was made before the Court of Common Pleas, and that the judgment thus confessed before any of the money was paid absorbed all the property of L. Hoyt.

Upon the facts thus presented before them, the Supreme Court vacated the order which had been made by

the Court of Common Pleas, and restored the judgment of Enos Hoyt to its priority. That decision has remained undisturbed and unquestioned since September Term, 1837.

. If in the present case, Mr. Clapp, before this affidavit was made, had paid the money to Mr. Parkhurst, with an understanding that it was to be used by him for purchasing goods and paying his notes as they became due, and sustaining his credit, but on the day after the levy, Parkhurst had constituted Ely, Clapp and Bowen his bankers, by depositing the funds with them, and taking their negotiable note for the amount, payable on demand, could it be successfully maintained that the judgment would be constructively fraudulent? I think not.

Wherein does this case substantially differ from the one now put? In each, we must recur to the intent, the *animus* which pervaded the transaction. If it was honest and pure, seeking to promote the benefit of the parties, and not to injure any one, and actual injustice has not been done, no sound principle of law, of morals, or of public policy can demand that such a construction should be given to an act of the legislature designed to place a check upon the conscience of a party, and to provide against the entries of improper and fraudulent judgments, as would require a mere *form of proceeding* to be *mechanically observed* for the purpose of saving the integrity of a judgment available at common law, and intended for honest purposes, from the invalidating effect of that statute.

Upon the literal construction contended for by the plaintiffs in error, how could a merchant secure and protect his confidential endorser? A's notes for large amounts, endorsed by B as accommodation, payable at different times, have been put in circulation by A in the regular course of his trade. Before any of the notes arrive at maturity, A, discovering that he must fail in business, wishes to indemnify and save B from loss through his

contingent liability on such paper. The notes are so scattered among the commercial community that it is not within B's power to find them, and anticipate their payments, as each shall become due; his liability upon it will be absolutely fixed by protest and notice, but before they all will mature, A must inevitably become insolvent. If B cánnot enter into such an engagement with A for making sufficient future advances for the payment of those notes, when at maturity, as will enable him to take a valid judgment by confession against A, because the amounts of the notes have not at the date of the affidavit been *actually* advanced and paid, and hence the money be technically due and owing from A to B, B must be remediless.

Such, I think, is not the understanding of merchants or of commercial lawyers; and if it be the proper interpretation of our statute, further legislation is demanded; because it will check and restrain that confidence which generally pervades a healthy business community, and will paralyze the laudable efforts of many young men who begin the world with valuable business talents, but without sufficient capital to encourage and sustain their honest industry without the aid of their friends.

If, in the language of Chief Justice Ewing in the case of Scudder *v.* Coryell, the design of the statute, in requiring the affidavit, was simply to prevent the entering up of judgments where no indebtedness existed really and in good faith, and to defeat fraudulent purposes, and, as he successfully argued before the Supreme Court in the case of *Warwick* v. *Matlack,* 2 *Hulst.* 165, " the fifth section of the act was merely meant to place a check upon the conscience of the party, and to provide against the entering of improper and fraudulent judgments," then the judgment in this case, embracing the moneys as well then due as the advances at the time agreed to be made, and afterwards made in good faith within a reasonable period, and before any other creditors had acquired rights by judgments and levy, is no such departure from the statute,

and tends to no such evils as should vitiate the judgment;" nor do the facts presented against the *bona fides* of the transaction bring the case within the mischief contemplated in the statute of frauds.

It was also contended, upon the argument, that if one promissory note be a good consideration, within the meaning of the statute, for another promissory note, two parties might exchange notes of equal amounts, and each confess a judgment to the other, and thus cause their respective properties to be covered by executions and levies. Grant that they might, yet, *cui bono*, if neither of them had creditors "with certain claims upon his property," who could impeach the transaction? If in such a case judgment creditors of either or both of the parties should apply to a proper tribunal for a preference of lien, the court would unquestionably order that one judgment should be set off against the other, thus paying the collusive parties in their own coin, and leaving the property of each to respond to the demands of his *bono fide* judgment creditors.

From the view which I have taken of the whole case, I conclude—

*First.* That a judgment good at common law cannot be attacked for a mere irregularity in the proceedings by any one not a party to the record.

*Second.* That a court should liberally exercise its equitable jurisdiction over confessed judgments for the detection of fraud and the promotion of fair dealing between debtors and creditors, and in a proper case they may award a feigned issue for a jury to try the fact of fraud.

*Third.* That a judgment by confession at common law without an affidavit is not absolutely void and fraudulent because of a non-compliance by either of the parties with the directions of the statute, but that the irregularity in the proceeding may be questioned by the defendant on a writ of error, and the absence of an affidavit may be looked upon as strong, if not a conclusive badge of fraud, in proceedings between contesting judgment creditors.

*Fourth.* That a judgment may be confessed in New Jersey to secure a pre-existing debt and future advances, or future advances alone, furnished in either case in fulfillment of an agreement originally made that the judgment should be a security for such advances—they being taken, when made, as parts of the original transaction; but that advances made after actual notice of an intervening encumbrance will not be protected by the judgment.

*Fifth.* That in the case before the court, neither actual fraud nor legal fraud has been established against the senior judgment creditors, and that they are entitled to priority in payment to the amount of the pre-existing indebtedness and of the advances actually made before the other judgments were confessed, notwithstanding the manner in which the consideration of the note is set out in the affidavit.

These conclusions, I think, maintain the law, as it has been settled and received in New Jersey for upwards of twenty years past; and if it be the prevailing sentiment of the bar and of the community that judgments by confession, which do not literally conform to the provisions of the present act respecting affidavits, ought to be absolutely void as to subsequent judgment creditors, and also that such creditors should be at liberty to attack judgments for irregularity in the proceedings, the legislature can pass a supplement to the statute in language which will put the question at rest for the future.

In my judgment, the order and rule of the Supreme Court should be affirmed, with costs.

*For Affirmance*—The CHANCELLOR, and Judges OGDEN, VREDENBURGH, CORNELISON and WOOD.

*For Reversal*—The CHIEF JUSTICE, and Judges POTTS, RYERSON, RISLEY, SWAIN and VALENTINE.

The term of office of Judge Arrowsmith, one of the judges who heard the argument, having expired February 6th, 1858, he was not present when the case was decided.

Clapp v. Ely.

On the announcement of the above vote, the court ordered the following rule to be entered in the minutes.

"This cause having been re-argued at the last term of the court, in presence of the Chancellor, Chief Justice, Justices Ogden, Potts, Vredenburgh, and Ryerson, and Judges Arrowsmith, Cornelison, Valentine, Risley, Swain, and Wood, (Justices Elmer and Haines having rendered the judgment of the Supreme Court in the case), and the court having taken time to advise thereon until this term, and the question being now taken on motion to reverse the judgment of the Supreme Court, the vote was as follows : *For reversal*—Green (C. J.,) Ryerson, Risley, Swain, for reversal as to all except the sum of three thousand and fifty-two dollars and ninety-four cents, the amount due the defendants in error when their judgment was confessed, and for that amount affirmance, Potts and Valentine. *For affirmance*—Williamson (Chancellor,) Ogden, Vredenburgh, Cornelison, and Wood; whereupon the court announced that the judgment of the Supreme Court stood in all things affirmed, according to the act of the legislature, which declares that no judgment of the Supreme Court shall be reversed by this court, unless a majority of those members of the court who are competent to sit on the hearing and decision of the case shall concur in such reversal; and thereupon the counsel for the plaintiff in error moved for leave to discuss the construction and validity of said act, and the court ordered that counsel be heard thereon, in full court, at the next term of the court, the cause to have priority on the list of causes at that time."

At June Term, the court decided that the above-mentioned law was unconstitutional, and that, even if it was constitutional, a majority of the judges competent to sit at the decision of the cause were in favor of reversal, and ordered that the judgment of the Supreme Court should be reversed except as to the sum of $3052.94.